COMMONWEALTH *vs.* MICHAEL L. CRAWFORD.

Suffolk. February 7, 1994. - March 21, 1994.

Present: WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Evidence,* Spontaneous utterance, Failure to produce witness. *Constitutional Law,* Confrontation of witnesses. *Homicide. Practice, Criminal,* Instructions to jury.

At a murder trial, the judge properly admitted in evidence certain statements of a four year old child under the spontaneous utterance exception to the hearsay rule. [361-364]

No substantial risk of a miscarriage of justice was created by the Commonwealth's not calling a competent child witness to testify at a murder trial, where the child's evidence was properly admitted under the spontaneous utterance exception to the hearsay rule and where the jury could properly conclude, based on all the evidence, that the defendant was guilty of involuntary manslaughter. [364-366]

At a murder trial, the judge properly denied the defendant's request for a missing witness instruction in circumstances where that person's evidence had properly been introduced through the spontaneous utterance exception to the hearsay rule, with the result that there was no apparent basis for the inference that the missing witness's evidence would have been unfavorable to the Commonwealth. [366-367]

Although at a criminal trial the judge should not have referred for contrast to the burden of proof that applies in a civil case, the jury could not have been misled or confused by the judge's instruction and reinstruction in accordance with *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850), on the appropriate standard of proof beyond a resonable doubt. [367-368]

INDICTMENTS found and returned in the Superior Court Department on July 19, 1990.

The cases were tried before *Herbert Abrams,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Willie J. Davis* for the defendant.

*Jane Woodbury,* Assistant District Attorney (*Daniel C. Mullane,* Assistant District Attorney, with her) for the Commonwealth.

GREANEY, J. The defendant, Michael L. Crawford, was tried before a jury in the Superior Court on two indictments charging him with murder in the first degree in connection with the killing of his girl friend and their unborn child. The jury found the defendant guilty of involuntary manslaughter as to each death, and he was sentenced to consecutive terms of imprisonment at the Massachusetts Correctional Institution, Cedar Junction. On appeal, the defendant argues that the judge should not have admitted in evidence hearsay statements by the couple's child as spontaneous utterances, and, even if properly determined to be spontaneous utterances, the admission of the statements, when the child was available to testify, violated his constitutional rights to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution. The defendant also argues that the judge erred by refusing to give the jury a missing witness instruction and by failing to instruct properly on reasonable doubt. We transferred the appeal to this court on our own motion and now affirm the judgments of conviction.

The jury heard the following evidence at trial. Kimberly Noblin, the victim, lived with her four year old daughter, Tiara, in an apartment in the Dorchester section of Boston. The defendant, Tiara's father, kept his clothes and other effects at the apartment and was staying there about three nights a week. In July, 1990, the victim was pregnant by the defendant. She was killed by a single gunshot wound to the face on July 7, 1990. The fetus died of oxygen deprivation caused by the victim's death.[1] The medical examiner testified

---

[1]At the time of the shooting, the male fetus weighed about two and one half pounds, was fifteen inches in length, and was between twenty-eight and thirty weeks in gestational age. The medical examiner testified that "[u]nder the right circumstances [the fetus] was viable, meaning it was old enough and had mature enough systems to survive outside of the mother, if delivered under appropriate circumstances."

that rigor was fully established when he arrived at the victim's apartment sometime after 10 P.M., and that, generally, rigor takes from four to six hours from the time of death to develop.

The defendant did not testify at trial, but a tape recording of a lengthy statement he voluntarily made to police on July 10, 1990, while accompanied by an attorney, was played for the jury. In the statement, the defendant said he left the victim's apartment early in the afternoon[2] of July 7, accompanied by his daughter. As they left, the victim was returning to the apartment. He took his daughter to a canteen truck operated by a friend, arriving there while it was still light. When it started to become dark, the defendant became concerned about keeping his daughter with him and sought to make child care arrangements. He was unable to reach his grandmother, with whom he sometimes left the child. He eventually went to the house of a friend of the victim, Stacey Galvez, who agreed to watch the child for a short time, until the child's maternal aunt or grandmother could pick her up. After that, the defendant returned to the canteen truck, stayed for awhile, and then left with a woman friend. Together they went to her apartment, where they watched videotapes and ate Chinese food before the defendant fell asleep on the couch at about 3 A.M. He learned of the victim's death the next morning at nine o'clock when he called his grandmother.

Brian Johnson, a friend of the defendant, testified that he telephoned the defendant at the victim's apartment at 3:30 P.M. The victim answered the telephone and told Johnson that the defendant was there, asleep. Around 4:30 P.M., Johnson drove to the apartment to find the defendant. He rang the doorbell and received no answer. No noise was coming from the apartment. Ricky Riley, the owner of the canteen truck, testified that the defendant arrived at the truck

---

[2]The defendant told the police that he did not wear a watch, and, in explaining to the police his movements on July 7, 1990, he gave very imprecise estimates as to time.

with his daughter in the early evening. Riley had no watch that day and was unsure of the exact time.

Stacey Galvez agreed that the defendant brought Tiara to her house around 8:30 P.M., and asked Galvez to babysit for Tiara. Galvez made arrangements for Tiara's grandmother (the victim's mother) to come get Tiara. The defendant left. Tiara stayed at Galvez's house for about thirty minutes, playing with her three year old son. Galvez had no discussion with Tiara.

Sometime after 9 P.M., the grandmother picked up Tiara. As she climbed into her grandmother's car, Tiara immediately said, "Daddy shot Mummy." (Tiara referred to the defendant as "Daddy.") She repeated this statement. After attempting to reach the victim by telephone, the grandmother drove to the apartment, let herself in with her set of keys and discovered the victim's body in the bedroom. As the grandmother ran out of the bedroom screaming, Tiara said to her, "Mummy's dead."

A neighbor, Yvonne Brown, who had heard the commotion, saw Tiara in the hallway. She did not know the child well. When the neighbor asked Tiara if she would be all right, Tiara responded, "Daddy . . . my Daddy killed my Mommy."

Detective John Parlon of the Boston police department was among the first police officers to respond to the scene. He asked Tiara what had happened in the apartment and she responded, "My Daddy shot my Mummy. Daddy said, 'Give me the gun,' and then I heard a big noise. Then Daddy took me to Stacey's house in a car." Police officers investigating the case never questioned Tiara again. She did not testify at trial. Her statements to her grandmother, the neighbor, and Detective Parlon were admitted in evidence under the spontaneous utterance exception to the hearsay rule.

1. The defendant filed a motion in limine seeking to exclude from evidence Tiara's statement, "Daddy shot Mummy," initially made to Tiara's grandmother (and repeated to two other witnesses) under the spontaneous utterance exception to the hearsay rule. The defendant argued to

the judge, as he does here, only that the spontaneity requirement for the exception was not met. The judge held a voir dire on the motion at which all the witnesses expected to be called at trial on the statements testified. The judge had previously interrogated Tiara in open court and ruled that Tiara was a competent witness. The requirements for admission of the hearsay statements as spontaneous utterances were satisfied.

"Under the spontaneous exclamation exception to the hearsay rule, 'a statement is admissible if its utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize and explain the underlying event.' *Blake* v. *Springfield St. Ry.*, 6 Mass. App. Ct. 553, 556 (1978). See *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 222-223 (1973). The statements ' "need not be strictly contemporaneous with the exciting cause" . . . Wigmore on Evidence (3d ed.) § 1750.' *Rocco* v. *Boston-Leader, Inc.*, 340 Mass. 195, 197 (1960). In determining whether an utterance meets the tests of admissibility, the trial judge 'ought to be given broad discretion. . . . [A]nd only in clear cases . . . of an improper exercise of discretion should his ruling be revised.' *Commonwealth* v. *McLaughlin, supra* at 223, quoting *Rocco* v. *Boston-Leader, Inc., supra.* See *Commonwealth* v. *Fuller*, 399 Mass. 678, 682 (1987)." *Commonwealth* v. *Brown*, 413 Mass. 693, 695-696 (1992). Particularly when the declarant is a young child who remains in the company of the alleged perpetrator after a traumatic event, precise contemporaneousness is not required. *Id.* at 695 (child's statement made about five hours after exciting event qualified as spontaneous utterance).

The evidence warranted the judge in finding at the conclusion of the voir dire, as he did, that Tiara had been in the defendant's custody after the killing, and that, when she left his custody, she made her initial statement at "the first safe opportunity, almost immediately on seeing her grandmother." This finding permits the inference that, during her brief stay with Stacey Galvez, Tiara may not have wished to

reveal to a nonfamily member what had happened. The evidence also warranted the judge's finding that the initial statement was made when a very young girl was under the extreme stress of her mother's death, and in a context where she could be expected to be truthful. The judge noted as well that he had held a separate hearing on Tiara's competency, and that Tiara "possessed the intelligence to comprehend the exciting nature of the event, as well as having sufficient capacity to observe, remember and give an expression to that which she had seen, heard or experienced." Finally, the evidence warranted the judge additionally finding that Tiara's statements to Yvonne Brown and Detective Parlon were products of the continuing stress of her mother's homicide.[3]

At the voir dire on Tiara's competency and the voir dire on the admission of her statements as spontaneous utterances, the basis of her knowledge of events in the apartment was not directly raised, and, therefore, not established. The focus of the first voir dire was whether Tiara had the capacity to be truthful, and the only challenge raised at the second voir dire was whether the statements qualified as spontaneous in the temporal sense. It is true that, when an extrajudicial statement is offered in court for its truth, the proponent of the statement may be required to establish that the declarant had personal knowledge of the information contained in the statement. See *Bouchie* v. *Murray*, 376 Mass. 524, 531 (1978); *Ricciardi* v. *Children's Hosp. Medical Ctr.*, 811 F.2d 18, 22 (1st Cir. 1987). See also 2 McCormick, Evidence § 272, at 221 (4th ed. 1992); 5 J. Wigmore, Evidence § 1424 (Chadbourn rev. ed. 1974). To the extent there was ambiguity about the basis for Tiara's statements, the defendant could have raised this issue during either voir dire. He did not. The point is not raised here. It may be inferred from Tiara's statement to Detective Parlon that she was present in the apartment during the shooting, and at least overheard

---

[3]The fact that Tiara's statement to Detective Parlon was made in response to his question, "[W]hat happened?" did not render the statement inadmissible. *Commonwealth* v. *Fuller*, 399 Mass. 678, 682-683 & n.8 (1987).

the event, even if she did not see it. There was no error in the admission of the evidence as spontaneous utterances.

2. The defendant argues that, because Tiara was found competent by the judge, and apparently was available to testify, the Commonwealth's failure to call her denied him his constitutional rights to confront an important witness in violation of the Sixth Amendment and art. 12. These contentions were not made below. Although we may consider issues on appeal not raised at trial, the power to do so is rarely exercised, and is exercised only in response to a serious and obvious error, creating a substantial risk of a miscarriage of justice. *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 4-6 (1986). *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). That situation is not present here.

(a) It is clear that the defendant's rights under the Sixth Amendment were not violated by the admission of Tiara's extrajudicial statements. In a recent decision, *White* v. *Illinois*, 502 U.S. 346 (1992), the United States Supreme Court held that the admission of hearsay evidence under the spontaneous utterance exception to the hearsay rule did not violate the confrontation clause of the Sixth Amendment, despite the failure of the prosecution to produce the declarant at trial or to demonstrate unavailability. *Id.* at 353-358. The Court's decision rested in part on its perception that such evidence generally was trustworthy and that its exclusion would not promote the "integrity of the factfinding process." *Id.* at 356-357, quoting *Coy* v. *Iowa*, 487 U.S. 1012, 1020 (1988), and *Kentucky* v. *Stincer*, 482 U.S. 730, 736 (1987).

(b) Tiara's statements were volunteered to her grandmother before anyone other than Tiara (and the defendant) knew that the victim had been shot. In none of her statements identifying the defendant as the shooter and recounting events in the apartment did Tiara adopt facts suggested to her by an adult questioner. She spontaneously volunteered the information. The statements could be considered by the jury to be credible evidence implicating the defendant in the victim's death. See *Commonwealth* v. *Brown, supra* at 696.

The jury heard evidence that the defendant was at the apartment on the day the victim was shot, and that he had access to a gun. The door of the apartment was locked when the victim's mother arrived; the defendant had a set of keys. Evidence of suicide was nonexistent. The shot that killed the victim was fired from a distance of at least two feet and no gun was found at the scene. Several people testified that they spoke with the victim on July 7. There was no evidence that she was despondent or suicidal.

To the extent that doubt remained about events in the apartment after Tiara's statements were taken into account, that doubt arose, as was previously discussed, from an uncertainty about the child's basis of knowledge. It is obvious that the child was present in the apartment, but unclear whether she saw, or only heard, the shooting. Her statement to Detective Parlon ("Daddy said 'Give me the gun.' Then I heard a loud noise"), suggested the possibility of an altercation between her father and mother, and left open some chance of accident. However, accident, was not, from what we can see, a live issue at trial, nor is it argued on appeal. In his statement to the police, given while he was accompanied by an attorney, the defendant maintained that he was not present at the apartment when the victim was shot. In his defense, he called several witnesses to substantiate his account of his movements. "Accident" was not mentioned in his closing argument. To bring that issue squarely before the jury, the defendant would have had to place himself in the apartment, a scenario which would have been inconsistent with his statement disclaiming his presence at, or any knowledge of, the shooting or the person responsible for it.

The jury were entitled to credit the evidence of Tiara's statements, and to conclude on all the evidence, including the circumstantial evidence, that the defendant shot the victim. They could infer consciousness of guilt from his denial that he was present. See *Commonwealth* v. *Eppich*, 342 Mass. 487, 492 (1961). The judge instructed the jury on both degrees of murder, voluntary and involuntary manslaughter, and the possibility that the killing was accidental. The jury's

verdicts reflect a rejection of the defendant's claim and are consonant with justice. See *Commonwealth* v. *Gabbidon*, *supra*. Because the defendant's claim of error was not raised below, we leave for another the day the question whether the confrontation provision of art. 12 requires the prosecution to establish the unavailability of a declarant before offering in evidence extrajudicial statements falling within the spontaneous utterance exception to the hearsay rule.[4]

3. The defendant's final contentions concern jury instructions and can be dealt with briefly. The defendant requested that the jury receive a missing witness instruction to the effect that, because the Commonwealth had failed to call Tiara as a witness, they could draw the adverse inference that her evidence would have been unfavorable to the Commonwealth. The judge denied the request. Instead, defense counsel was permitted to argue to the jury that Tiara's failure to testify prevented them from seeing the most important witness in the case.

The adverse inference permitted by the so-called missing witness instruction is based on the premise that the party not calling an apparently favorable witness is aware that the witness may possess evidence adverse to the party declining to call the witness, who thereby avoids the issue by wilfully attempting to withhold or conceal significant evidence. See *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). The instruction should be given only in clear cases and with caution. *Id.* See *Commonwealth* v. *Franklin*, 366 Mass. 284, 294 (1974); *Commonwealth* v. *Finnerty*, 148 Mass. 162, 167 (1889).

Tiara was the defendant's daughter, and, because of their relationship, would have been as available to testify for the

---

[4]As the defendant acknowledges, *Commonwealth* v. *Bergstrom*, 402 Mass. 534 (1988), on which he relies for his claim under art. 12, addresses facts and an issue very different from the facts and issue in this case. *Bergstrom* considered whether it was permissible, under art. 12, for a child complainant of sexual abuse to testify against the accused on closed circuit television rather than in the presence of the accused. *Bergstrom* neither addressed nor resolved the issue raised here by the defendant.

defendant as for the Commonwealth. It appears that the Commonwealth introduced Tiara's evidence through a properly applied exception to the hearsay rule to spare her the trauma of reliving in court the horrifying experience she had been exposed to when her father killed her pregnant mother. This is not a case in which the jury heard nothing from a witness the Commonwealth would have been expected to call. The jury heard the substance of Tiara's testimony in the form of her extrajudicial statements. There was no apparent basis for the inference the requested instruction would have suggested to the jury. The judge properly denied the request.

4. In his main instructions to the jury, the judge defined reasonable doubt in accordance with *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), and went on to contrast the higher criminal burden of proof with the burden of proof that applies in a civil case. When the jury asked again during deliberations for a redefinition of reasonable doubt, the judge repeated the full *Webster* instruction. The defendant argues that the judge's reference, for comparison purposes, to the civil burden of proof in his main charge requires a new trial.

"To determine whether a definition of reasonable doubt accurately conveys the meaning of the term, it is necessary to consider the charge as a whole." *Commonwealth* v. *Wood*, 380 Mass. 545, 548 (1980), quoting *Commonwealth* v. *Watkins*, 377 Mass. 385, 388, cert. denied, 442 U.S. 932 (1979). See also *Commonwealth* v. *Beverly*, 389 Mass. 866, 870-871 (1983). The proper language for instructing a jury on the concept of reasonable doubt comes from *Commonwealth* v. *Webster*, *supra*. See *Commonwealth* v. *Gerald*, 356 Mass. 386, 390 (1969); *Commonwealth* v. *Lanigan*, 12 Mass. App. Ct. 913, 915 (1981), cert. denied sub nom. *Maloney, Superintendent, Mass. Correctional Inst.* v. *Lanigan*, 488 U.S. 1007 (1989).

The judge should not have referred to the civil preponderance of the evidence standard in his main charge. That reference, however, was placed with instructions that fully conveyed the principles of the *Webster* charge. The jury, after their question during deliberations, were reinstructed on

*Webster* alone. The jurors could not have been misled or confused as to the appropriate standard of proof. See *Commonwealth* v. *Murphy*, 415 Mass. 161, 166-168 (1993).

*Judgments affirmed.*