## COMMONWEALTH *vs.* MARK NAPOLITANO.

No. 96-P-783.

Middlesex. November 13, 1996. - April 30, 1997.

Present: DREBEN, GREENBERG, & LAURENCE, JJ.

*Evidence,* Hearsay, Spontaneous utterance, Unavailable witness. *Constitutional Law,* Confrontation of witnesses.

At the trial of indictments the judge did not abuse his discretion in admitting in evidence certain inculpatory out-of-court statements of the victim under the spontaneous exclamation exception to the hearsay rule. [553-554]

There was no merit to a criminal defendant's claim that he was denied his right to confrontation guaranteed by art. 12 of the Massachusetts Declaration of Rights by the admission in evidence under the spontaneous exclamation exception to the hearsay rule of statements of the victim without a showing that the victim was unavailable, particularly where the defendant had called the victim as a defense witness, and where the victim had recanted her out-of-court statements. [554-559]

INDICTMENTS found and returned in the Superior Court Department on September 7, 1995.

The cases were tried before *Robert H. Bohn,* J.

*Edward B. Gaffney* for the defendant.

*Marian T. Ryan,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. The defendant, Mark Napolitano, was convicted by a jury of assault and battery by means of a dangerous weapon and assault and battery on Jennifer Botto. He contends that his trial was tainted by two unpreserved errors that created a substantial risk of a miscarriage of justice: (1) the trial judge allowed the Commonwealth to introduce damaging testimony regarding Botto's out-of-court statements against him under the "excited utterance" (or "spontaneous exclamation") exception to the hearsay rule, even though the statements did not properly fall within that exception; and (2)

those out-of-court statements should not have been admitted, even if they were within the exception, because the Commonwealth failed to establish the unavailability of Botto, who was physically available (and in fact testified for the defendant) but was not made a prosecution witness. That failure, the defendant claims, violated his right of confrontation under art. 12 of the Massachusetts Declaration of Rights, which guarantees a defendant the right "to meet the witnesses against him face to face." We see no merit in the defendant's arguments and affirm.

The defendant's convictions arose out of an incident at Horn Pond, Woburn, on the evening of August 21, 1995. At approximately 9:30 P.M., Joan Belair, who lived across the street from the pond, heard "a lot of screaming," loud and prolonged, from the area of the pond. The screams sounded as if made by a female. Walking toward the location of the continued screaming, Belair heard the same high-pitched voice scream "Help me" several times. Peering down toward the direction of the screams, Belair saw two figures at the edge of the pond, about thirty feet away. She saw the larger figure's arms move quickly up and down. The smaller person, whose body was between the arms as they went up and down, again screamed for help as Belair watched. She also heard the two figures yelling about "a chain." Apprehensive about what appeared to be a violent situation, Belair returned home and called the Woburn police.

At the same time, Charles King, sitting at a picnic table next to the pond parking lot with a friend, heard several loud female screams from the pond area, about a quarter-mile away. He ran toward the screaming, which continued for at least two minutes. As he approached the pond, he saw a man and a woman standing next to the water's edge, face to face, apparently having a vehement argument. The woman, who turned out to be Botto, was wet, dirty, crying, very upset, and tugging and pulling at the man. As King drew near the couple to ask what they were doing and what was wrong, the woman continued screaming, intelligibly shouting at one point, "he's got my baby's ring." King heard the man say he would return the ring when he got his chain back. The man then ran away through the bushes, apparently upon observing King's approach.

After the man (who was identified by Botto soon thereafter

as the defendant) fled, King and his friend walked Botto to an area under a street light. There King saw that Botto's head and shirt were soaked and blood was running from her head down the side of her face onto her shirt. She was extremely agitated and on the verge of hysteria. Leaving Botto with his friend, King ran to the nearest house, which was Belair's, to ask the occupants to call "911." Informed that it had already been done, King ran back to help Botto across the street to the Belair home. As they proceeded, King asked Botto what had happened to her. She replied, crying and stuttering, that her boy friend (the defendant) had tried to drown her. She haltingly described how, as she struggled with the defendant, she had twisted her head to pull it out of the water so she could breathe. As she did so, the defendant had, she said, grabbed her head and "bashed it" on a rock.

By the time Botto was brought to the Belair home, about five to ten minutes had elapsed since Belair had witnessed the two figures at the water's edge. While awaiting the police, Belair, a nurse, saw that Botto, who was "very petite," was visibly shaken and crying; her head and clothes were wet; her face and arms had blood on them; her shirt was soiled with blood, sand, and wet leaves; there was a puncture wound over her left eye; and she had scrapes and abrasions on one arm and one leg. While administering first-aid, Belair asked Botto how she had been injured. Still shaking and crying, Botto told her that her boy friend (the defendant) had tried to kill her by attempting to drown her three times.

Police officers and emergency medical technicians (EMTs) arrived at approximately 10:00 P.M., removing Botto from the Belair home a few minutes thereafter. Throughout her conversations with the officers and the EMTs, Botto was crying and screaming in pain. Botto continued to be very distraught in the emergency room of Boston Regional Medical Center, where she was examined and treated at approximately 10:40 P.M. Having learned from Botto that the defendant was her attacker and where he lived, the responding police officers twice searched the pond area and nearby streets for him in vain. Returning to the defendant's address after an initially unsuccessful visit, they discovered the defendant hiding in the attic and arrested him.

Prior to trial, the defendant moved "for a voir dire and to exclude . . . statements of Jennifer Botto." The bases for the

motion were that "Ms. Botto presently indicates that at the time she made certain statements, she was enraged at the defendant, [and] made statements which she now asserts are untrue," and that the statements did not qualify as spontaneous or excited utterances. After a hearing and review of memoranda, the trial judge denied the motion, ruling that the statements by Botto to King and Belair, which the Commonwealth had disclosed would be offered in its case-in-chief, were admissible under the hearsay exception for excited utterances. (The defendant made no reference to his constitutional right of confrontation in his argument on the motion and later failed to object to King's and Belair's hearsay testimony at trial; our review is limited, therefore, as the defendant acknowledges, to ascertaining whether the challenged errors, if errors they be, created a substantial risk of a miscarriage of justice.)

After the Commonwealth had completed introducing its evidence — the highlights of which were King's and Belair's testimony regarding Botto's statements at the scene incriminating the defendant — the defendant presented a single witness in his defense. That witness was Botto, who abjured her charges against the defendant. She admitted screaming at and arguing with the defendant, over the defendant's interest in another woman, and admitted making the statements reported by King and Belair. She denied, however, that the defendant had assaulted her. Her injuries, she claimed, resulted from her own attempts to attack the defendant, during which she slipped and fell several times, scraping her hands and knees and hitting her head on a rock. In her version, the defendant was trying to pull her out of the water and assist her after she fell. She stated that she had lied when she made the statements testified to by King and Belair because she was so angry at the defendant at the time that she wanted to get him into trouble.

Botto was confronted on cross-examination with numerous other statements she had made attributing a murderous assault to the defendant and consistent with the recollections of King and Belair. Those included statements to one of the officers who came to the Belair home, to a nurse at the hospital, to her own physician the day after the assault, in an affidavit filed with the Woburn District Court for the purpose of obtaining an abuse prevention order that same day, and to a

police investigator three days after the incident. Botto claimed she did not remember making such statements and that, if she had, they were also lies fueled by her jealous rage at the defendant.

The Commonwealth then called, as rebuttal witnesses, one of the EMTs who had been in the ambulance that transported Botto to the hospital the evening of the incident and the police investigator who had interviewed Botto three days thereafter. The EMT recounted that Botto, who was upset to the point of hysteria, told him that her boy friend had banged her head against the rocks and tried to force her head into the water while she screamed for help. The investigator recounted similar revelations by Botto, elaborating that Botto had also told her that the defendant, while holding her head underwater, had yelled that "he wanted her to die . . . and her daughter to die."

We need not dwell upon the defendant's essentially conclusory argument that the trial judge abused his broad discretion, *Commonwealth* v. *Hampton*, 351 Mass. 447, 449 (1966), when he determined that the Botto statements testified to by King and Belair met the tests of admissibility for the excited utterance exception to the hearsay rule. On the evidence before him, the judge properly determined that Botto's out-of-court statements satisfied both the "spontaneity" and the "explanatory" tests under the pertinent authorities. The statements did not have to be strictly contemporaneous with the exciting cause, *Commonwealth* v. *Brown*, 413 Mass. 693, 695-696 (1992), and were made within moments of an independently observed hostile event that left the declarant visibly injured and agitated to the point of hysteria and while the declarant remained in that state. See *Commonwealth* v. *Hampton*, 351 Mass. at 450; *Commonwealth* v. *Sellon*, 380 Mass. 220, 222-223, 229-230 (1980); *Commonwealth* v. *Puleio*, 394 Mass. 101, 104-105 (1985); *Commonwealth* v. *Clary*, 388 Mass. 583, 589 (1983); *Commonwealth* v. *Rivera*, 397 Mass. 244, 247-248 (1986); *Commonwealth* v. *Williams*, 399 Mass. 60, 68-69 (1987); *Commonwealth* v. *Fuller*, 399 Mass. 678, 682-683 (1987); *Commonwealth* v. *Cohen*, 412 Mass. 375, 377, 391-392 (1992); *Commonwealth* v. *Crawford*, 417 Mass. 358, 361-363 (1994); *Commonwealth* v. *Grant*, 418 Mass. 76, 80-82 (1994); *Commonwealth* v. *Tiexeira*, 29 Mass. App. Ct. 200, 205-206 (1990); *Commonwealth* v. *Alvarado*, 36 Mass.

App. Ct. 604, 605-606 (1994); *Commonwealth* v. *Kirk*, 39 Mass. App. Ct. 225, 226-228 (1995).

It is also manifest that the exciting event which led to Botto's emotional agitation and subsequent statements was the physical attack she reported, not (as the defendant posits) an argument between her and the defendant about a ring and a chain. Cf. *Commonwealth* v. *Alvarado*, 36 Mass. App. Ct. at 606 ("the statement itself is . . . sufficient proof of the exciting event"). Her utterances, as reported, patently related to the underlying event that prompted them, by characterizing and explaining Botto's perception of the cause of her hysteria and injuries. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285-286 (1990). Enjoined as we are that " 'only in clear cases . . . of an improper exercise of discretion should [the judge's] ruling [in admitting excited utterances] be revised,' " *Commonwealth* v. *Grant*, 418 Mass. at 81 (citations omitted), we conclude that the evidence provided more than ample support for the judge's decision to admit King's and Belair's testimony under the excited utterance exception to the hearsay rule.

The defendant's appellate hopes are ultimately pinned on his claim that he was denied his art. 12 right of confrontation. He asserts that the out-of-court Botto statements, even if qualified excited utterances, should have been excluded because the Commonwealth failed to demonstrate the hearsay declarant's unavailability. He relies primarily on dictum in *Commonwealth* v. *Colin C.*, 419 Mass. 54, 63 (1994), for the proposition that no hearsay, however reliable, may ever be admitted against a criminal defendant unless "the necessity for admitting the out-of-court statement [is demonstrated] by establishing the declarant's unavailability to testify during the trial." "Reliability" and "particularized guarantees of trustworthiness," *ibid.*, constitute requisite attributes of admissible hearsay but present no issue here, because spontaneous exclamations represent a "firmly rooted exception to the hearsay rule," *Commonwealth* v. *Kirk*, 39 Mass. App. Ct. at 232, deemed "trustworthy," *Commonwealth* v. *Crawford*, 417 Mass. at 364, and possessed of "a special guarantee of reliability." *Opinion of the Justices*, 406 Mass. 1201, 1208 (1989). We are not persuaded by the defendant's argument, which is founded on a defective premise — indeed, one that virtually defies common sense as well as ignores

"[t]he necessities of the case and the attainment of justice."
*Commonwealth* v. *Colin C.,* 419 Mass. at 63.

This case does not involve a genuine art. 12 confrontation
clause issue. The elements of a defendant's right of confronta-
tion are "the physical presence of a witness [who has] testi-
f[ied] against him, the witness's testimony . . . under oath,
the defendant's opportunity to cross-examine the witness and
the jury's opportunity to observe the witness's demeanor."
*Commonwealth* v. *Sanchez,* 423 Mass. 591, 596-597 (1996).
Accord *Commonwealth* v. *Amirault,* 424 Mass. 618, 629-631
(1997). All those elements literally attended the defendant's
trial (the requirement of the oath being served by the special
reliability of the excited utterances, see *Opinion of the Jus-
tices,* 406 Mass. at 1208). The two core aspects of confronta-
tion are "to have witnesses testify in [the defendant's] pres-
ence," and the opportunity to cross-examine. *Commonwealth*
v. *Bergstrom,* 402 Mass. 534, 542 n.10 (1988). They both oc-
curred here in the most concrete manner, in the form of the
defendant's full examination of Botto, literally face to face,
see *Commonwealth* v. *Amirault, supra* at 631-632, and the
elicitation of her favorable testimony that the statements she
admittedly made to King and Belair were vengeful lies.

The defendant baldly asserts, however, that his confronta-
tion right could *only* be constitutionally satisfied by "hav[ing]
the jury observe Botto's demeanor *as she testified against him,*
that is, *as she made* the accusatory statements." We reject
this dubious proposition as unsupported by any case author-
ity or reasoned argument, contrary to Mass. R.A.P. 16(a)(4),
as amended, 367 Mass. 921 (1975). More fatally, it is
contradicted by the many decisions that have allowed
trustworthy incriminating hearsay to be admitted despite the
fact that the jury in such situations never observe the de-
meanor of the declarant making the inculpatory statement.
See, e.g., *Commonwealth* v. *Gallo,* 275 Mass. 320, 331-334
(1931) (declarant dead, insane); *Commonwealth* v. *Clark,* 363
Mass. 467, 470-471 (1973) (declarant missing or physically
unable to appear); *Commonwealth* v. *DiPietro,* 373 Mass. 369,
376-383 (1977) (declarant invokes marital privilege); *Com-
monwealth* v. *Canon,* 373 Mass. 494, 499-500 (1977), cert.
denied, 435 U.S. 933 (1978) (declarant invokes privilege
against self-incrimination); *Commonwealth* v. *Bohannon,* 385
Mass. 733, 742 (1982) (previously testifying declarant un-

available for any "legally sufficient reason"); *Commonwealth* v. *Jones,* 400 Mass. 544, 547 (1987) (absent declarant's incriminating statements made in defendant's presence treated as adoptive admissions).

The defendant's questioning of Botto as his defense witness in actuality addressed most of the recognized goals of cross-examination: "using the testimony of th[e] witness to discredit the unfavorable testimony of other witnesses . . . using the testimony of th[e] witness to corroborate the favorable testimony of other witnesses . . . and . . . using the testimony of th[e] witness to contribute independently to the favorable development of your own case." Keeton, Trial Tactics and Methods, at 94 (2d ed. 1973). See also Wellman, The Art of Cross-Examination, at 28-29, 216 (4th ed. 1936) (among the purposes of cross-examination are "to elicit some new facts in our own favor . . . discrediting the [witness's previous] *testimony* . . . [as opposed to] discrediting the *witness* . . . [and i]f the [previous] testimony of a witness is false only in the sense that it exaggerates, distorts, garbles, or creates a wrong sense of proportion, then the function of cross-examination is to whittle down the story to its proper size and its proper relation to other facts"); Murray, Basic Trial Advocacy, at 156, 179-180 (1995) ("In many cases . . . what is technically cross-examination is performed very much like direct examination. Sometimes the witness is not adverse . . . . Or the witness being 'cross-examined' may be the cross-examiner's own party or witness . . . . If the truth of [the] witness's testimony is important to a party's picture before the factfinders . . . the cross-examiner will . . . make sure that the witness remembers and relays accurately the favorable facts the cross-examiner is hoping to extract"). Compare, in this regard, *Commonwealth* v. *Alvarado,* 36 Mass. App. Ct. at 605, 607 (defendant's confrontation right held satisfied where police officers testified to declarant's excited utterances that defendant had just bitten her, but when called as witness by prosecution declarant denied defendant had bitten her and refused to testify further for the prosecution, invoking her privilege against self-incrimination, and in a limited cross-examination defendant got witness to admit she was angry at defendant on the day she spoke with police officers and that another person, not the defendant, had bitten her); *Commonwealth* v. *Tanso,* 411 Mass. 640, 648 (1992), and *Com-*

*monwealth* v. *Childs*, 413 Mass. 252, 262 (1992) ("Cross-examination, to pass muster under the confrontation clause, does not have to be a perfect cross-examination").

In sum, the "mission" of the confrontation clause — "to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement,' " *Commonwealth* v. *Bohannon,* 385 Mass. at 746 (citation omitted) — was fully realized in this case. The defendant has no legal or logical complaint of any deprivation of his confrontation rights on this record.

Further bases for rejecting the defendant's confrontation clause argument in regard to excited utterance can be seen in the following considerations: (1) Excited utterance hearsay has been judicially viewed as of such substantial trustworthiness that it "may justifiably carry more weight . . . than a similar statement offered [subsequently] in the relative calm of the courtroom." *White* v. *Illinois,* 502 U.S. 346, 356 (1992). (2) The deeply rooted hearsay exception for excited utterances is deemed so specially reliable that the usual requirement of proving the declarant unavailable is dispensed with. See *Hetel* v. *Messier's Diner, Inc.,* 352 Mass. 140, 142 (1967); Proposed Mass. R. Evid. 803(2); McCormick on Evidence, at 216 (4th ed. 1992). (3) The confrontation rights guaranteed by the Sixth Amendment to the United States Constitution are not violated by the introduction of excited utterance hearsay despite the prosecution's failure to demonstrate the declarant's unavailability. *White* v. *Illinois,* 502 U.S. at 353-357; *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 224 (1973). (4) "The confrontation clauses of the Massachusetts Declaration of Rights and of G. L. c. 263, § 5, are equivalent to that of the Sixth Amendment." *Commonwealth* v. *Childs,* 413 Mass. at 260. (5) No decision has been cited or found holding that the confrontation clause of art. 12 imposes a stricter standard than that of the Sixth Amendment; cf. *Commonwealth* v. *Harkess,* 35 Mass. App. Ct. 626, 629 n.1 (1993) (doubting appropriateness of Appeals Court as forum to announce any such rule in the first instance). (6) At least one recent decision has explicitly held (in the case of prior recorded testimony at a probable cause hearing by a missing declarant) that art. 12 does not provide more confrontation protection than the Sixth Amendment. *Commonwealth* v.

*Siegfriedt,* 402 Mass. 424, 430 (1988). (7) The rationale of *Siegfriedt* — that there is no violation of the constitutional right of confrontation where the hearsay is reliable and "the defendant [has] had an adequate opportunity to cross-examine the witness," *id.* at 430-431 — applies here, for the reasons set forth in the four preceding paragraphs. (8) The defendant's reliance on the dictum in *Commonwealth* v. *Colin C.,* 419 Mass. at 63, as establishing a greater confrontation right under art. 12 than under the Sixth Amendment, is unfounded. That decision nowhere mentions any such broader confrontation right, and the ratio decidendi is limited to statements by alleged child abuse victims under age ten offered pursuant to G. L. c. 233, § 81. See *id.* at 61-66. Such statements are recognized as fundamentally less reliable than spontaneous exclamations. See *id.* at 65; *Opinion of the Justices,* 406 Mass. at 1213-1216.

Finally, even were the excited utterance exception subject to an unavailability condition — a contention we deem unsupported — it would have been satisfied here. Botto's unreserved recantation of her prior accusations and exculpatory testimony for the defendant made her practically unavailable as a witness for the prosecution. She was effectively unavailable in the same sense that a declarant who refuses to testify based upon the assertion of her constitutional privilege against self-incrimination is considered unavailable, so that the declarant's reliable hearsay statements may then be admitted as evidence. See *Commonwealth* v. *Koonce,* 418 Mass. 367, 378 n.6 (1994); *Commonwealth* v. *Alvarado,* 36 Mass. App. Ct. at 606-607. Botto was also practically unavailable to the Commonwealth by virtue of the principle of *Commonwealth* v. *Benoit,* 32 Mass. App. Ct. 111, 114-117 (1992). *Benoit* holds improper the prosecution's putting on a witness for the sole purpose of impeaching that witness's testimony, when the prosecution knows beforehand that such testimony will not support its case, by prior inconsistent statements.

We conclude that under applicable legal principles the circumstances of this case do not present a situation justifying resort to our "rarely exercised" authority to determine that unpreserved error was so "serious and obvious" as to create a substantial risk of a miscarriage of justice. *Commonwealth* v *Pares-Ramirez,* 400 Mass. 604, 609 (1987). We particularly stress the defendant's unfettered opportunity to examine Botto

face-to-face and the Commonwealth's other evidence, consistent with the proffered spontaneous utterances, linking the defendant to the crimes charged. That corroborative evidence included Botto's screams and numerous cries for help heard by King and Belair over an extended period of time; Belair's viewing the defendant standing near or at the water's edge holding some part of Botto's body between his arms and making rapid up and down movements with his arms; King's seeing Botto and the defendant arguing face-to-face at the water's edge; King's and Belair's observations that Botto was agitated, near-hysterical, wet, soiled and suffering a variety of injuries; the defendant's fleeing the scene when King approached to investigate; the defendant's later apprehension by the police while hiding in an attic; and Botto's statements immediately after the incident to police, EMTs, and hospital personnel, which were entirely consonant with the unobjected-to hearsay testified to by King and Belair.

*Judgments affirmed.*