NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-944

COMMONWEALTH

vs.

ANDRE HENDERSON.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant appeals from his conviction of murder in the second degree, as a lesser included offense of murder in the first degree, and from the denial of his motion for a new trial.[1] He argues that his trial counsel was ineffective for failing to request a jury instruction on voluntary manslaughter based on reasonable provocation and for failing to introduce certain evidence, that the prosecutor improperly elicited testimony commenting on the defendant's postarrest silence, and that the

_____

[1] The defendant was also convicted of carrying a firearm without a license and carrying a loaded firearm without a license, but raises no argument on appeal regarding those convictions.

trial judge erred in admitting a speculative statement as an excited utterance.  We affirm.

Background.  1.  The Commonwealth's case.  The defendant and the victim had known each other for many years and were codefendants in a criminal case in 2008.  The victim believed that the defendant had "snitched" on him in connection with that case.

On June 23, 2017, the victim was released from prison on a sentence he was serving in a different case.  Three days later, the victim and his cousin, Shaquille Buckmire-James, drove to a restaurant in the Mattapan section of Boston.  As they got out of their car, the victim saw the defendant standing on the porch of a house across the street[2] and said to Buckmire-James, "[T]hat's the guy that snitched on me."  The defendant was making hand motions and yelling to the victim, but Buckmire-James could not hear what he was saying.  The victim yelled back, "I'm not worried about you," and "[I]f I wanted you dead, you would be dead."

After this exchange Buckmire-James saw the defendant go into the house and come back out, tuck in the back of his shirt, and cross the street.  The defendant and the victim proceeded to have a "heated" conversation in front of the restaurant.  An

_____

[2] The defendant's girlfriend lived in the first-floor unit of the house.

2

eyewitness, Andrew Marshall, passed by them while walking into the restaurant and overheard the "big guy . . . telling the little guy, he was a snitch or something" in an angry tone of voice.[3]  The "little guy" appeared to be afraid, and Marshall heard him say twice that he "didn't want a problem."

After several minutes of conversation, the defendant shot the victim four times:  in the left side of his cheek, in the left side of his chest, and twice in the back.[4]  A passing motorist heard the shots and then saw a man "not running but . . . trotting away" from the restaurant.  A second motorist also heard the shots, turned and looked in that direction, and saw a man with a gun in his hand.  Through her rearview mirror, she saw the shooter running away with his hands swinging in the air, making a "lassoing" motion with his finger.

A warrant issued for the defendant's arrest.  On August 15, 2017, the defendant was located in Alabama and arrested on the warrant.

2.  The defendant's case.  The defense theory at trial was self-defense.  In support, the defendant testified as follows.

---

[3] There was evidence that the defendant was five feet, nine inches tall, and weighed about 175 pounds, whereas the victim was six feet, two inches tall, and weighed 313 pounds.

[4] The medical examiner testified that there may have been a fifth shot, which created an abrasion on the back of the victim's left shoulder.

3

The defendant and the victim met in 2005 or 2006 and were once friends. Their relationship soured as a result of the 2008 case. Although the defendant did not give any evidence against his codefendants, rumors began circulating in the neighborhood that he was a "snitch."

Because of the rumors, the defendant became the target of violence. While in jail in 2010, the defendant got into a fight with another inmate who accused him of being a "rat." From 2010 to 2016, the defendant was "jumped" four times by people who believed he was a "snitch." The defendant also had a few arguments with the victim about the situation, and the victim once started to pull a weapon before others intervened. The defendant knew that the victim had access to firearms and had seen the victim with a firearm before. To protect himself, the defendant acquired a pistol in 2010.

In June 2017 the defendant was feeling "[p]aranoid" because he had learned that the victim was being released from prison and was asking about the defendant's whereabouts. Two days before the murder, the defendant heard that the victim was "cruising around looking for [him]." Worried about being spotted, the defendant did not leave the house the next day.

The day of the murder, the defendant drank over a pint of rum to calm his nerves and went out on the porch to smoke a cigarette. A car pulled up across the street, and the defendant

4

saw the victim get out. As the defendant turned to go back in the house, the victim called out to him and waved at him "to come here, come here." When the defendant replied, "[N]o you come here, you come here," the victim said, "[I]f I wanted you dead, you'd be dead." The defendant took this to mean that maybe they could "squash this situation" and, with his gun in his back pocket, crossed the street to talk to the victim.

The defendant extended his hand to shake the victim's hand, but the victim refused it. The defendant told the victim that he did not want any problems and was not a "snitch" and asked that the victim "call his goons off [the defendant's] girlfriend's house," explaining that there were "kids in that house." The victim was not interested in resolving the situation and instead "gave [the defendant] the run down on seeing [him] and [his] girl[friend] walking up and down the street with [their] daughter."

When the defendant again asked the victim to stay away from the house, the victim said, "You're a rat and the next time you see me, I'm kicking your door and hit you and yours." The defendant took this to mean that the victim was going to try to kill him "and whoever got in [the victim's] way." By this point "half [the defendant's] heart was in [his] stomach, the other half of [his] heart was in [his] throat." The defendant told the victim that "he can't do that," to which the victim replied

that "he can do what he wanted" and "nobody can stop him." At this moment the defendant "checked out," which he described as his "body [going] to autopilot."

While this conversation was happening, the defendant saw Buckmire-James walking back and forth and "mean mugging" him. The victim was also "moving around pretty aggressive" -- "hand gesturing" and "puffing up his chest" -- and was making comments under his breath to Buckmire-James. Just prior to firing the shots, the defendant saw the victim put his phone in his pocket and then "attempt[] to lift his shirt with his left hand" while "reach[ing] with his right." Because the defendant's "body was on autopilot," he took his gun from his back pocket and fired.

The defendant ran from the scene, believing that, even if the victim did not have a gun, Buckmire-James did. As he was running, he saw a group of people gathered a couple streets over. Believing that "the situation [had] escalated from dangerous to critical," the defendant waved his arms and yelled at the group to go in the house.

Discussion. 1. Ineffective assistance of counsel. The defendant raised his claims of ineffective assistance through a motion for a new trial, accompanied by an affidavit from trial defense counsel. A judge other than the trial judge, who had since retired, held an evidentiary hearing on the motion, at which defense counsel and three other witnesses testified. The

6

motion judge then issued a detailed decision denying each of the defendant's claims.  We review that decision for an abuse of discretion, deferring to the motion judge's assessment of the credibility of the witnesses at the evidentiary hearing.  See Commonwealth v. Kirkland, 491 Mass. 339, 352 (2023).  We are in as good a position as the motion judge to evaluate the trial record.  See id.

a.  Failure to request instruction on voluntary manslaughter based on reasonable provocation.  The motion judge found that the omission of an instruction on reasonable provocation was the result of a strategic choice by defense counsel.  Although defense counsel averred in his affidavit that he "did not have a strategic reason for not requesting [the] instruction," the motion judge's finding to the contrary is supported by defense counsel's testimony at the evidentiary hearing.  In particular, defense counsel testified that he reviewed the instruction prior to the charge conference and, although "it was a tough call," decided not to ask for it because he had concerns about the language, "mere words alone are not sufficient to use deadly force."  Defense counsel further explained that he knew he "was getting second degree[,]

7

most of the manslaughter instruction, [and] self-defense";[5] he considered the fact that the victim "didn't have a weapon and there was no sudden combat prior to the words that he uttered to [the defendant] before the shooting"; and so, after conducting "a balancing test," he decided that the "mere words" language in the reasonable provocation instruction "might have hurt a little bit more . . . than helped."  This testimony shows that defense counsel made a strategic decision not to request the instruction, as the motion judge found.

Our resolution of the defendant's claim thus depends on whether he has demonstrated that defense counsel's strategic decision was "'manifestly unreasonable' when made" and deprived the defendant of an available, substantial ground of defense. Commonwealth v. Acevedo, 446 Mass. 435, 446 (2006), quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978). "[R]easonableness does not demand perfection," nor is it "informed by what hindsight may reveal as a superior or better strategy."  Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015).  Rather, "[o]nly 'strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent' are manifestly unreasonable."  Commonwealth

---

[5] The trial judge instructed the jury on murder in the second degree, voluntary manslaughter based on excessive use of force in self-defense, and self-defense.

8

v. Pillai, 445 Mass. 175, 186-187 (2005), quoting Commonwealth v. Levia, 385 Mass. 345, 353 (1982).

To establish a deprivation of a substantial ground of defense, the defendant must show that he would have been entitled to an instruction on reasonable provocation had defense counsel asked for one. See Acevedo, 446 Mass. at 442. "Reasonable provocation is provocation that 'would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint.'" Id. at 443, quoting Commonwealth v. Walden, 380 Mass. 724, 728 (1980). Although reasonable provocation and excessive use of force in self-defense are "closely related" theories of voluntary manslaughter, they "are also distinct." Commonwealth v. Glover, 459 Mass. 836, 841, 842 (2011). A defendant is therefore "entitled to jury instructions on voluntary manslaughter based on both theories where the evidence supports them." Id.

Here, we need not decide whether the evidence supported an instruction on reasonable provocation because, assuming that it did, defense counsel's decision to forgo the instruction was not manifestly unreasonable. We view Glover as controlling on the issue. There, as in this case, defense counsel pursued theories of self-defense and voluntary manslaughter based on excessive use of force in self-defense, while declining an instruction on

9

voluntary manslaughter based on reasonable provocation.  See Glover, 459 Mass. at 840, 844.  The court held that, while a reasonable attorney might have chosen to request an instruction on reasonable provocation (as it would not have been inconsistent with the theories that defense counsel did pursue), defense counsel's decision was nonetheless not manifestly unreasonable for three reasons:  (1) because the defendant would have been acquitted had the jury credited his claim of self-defense, it was "reasonable to focus the jury on that theory rather than reasonable provocation, which at best could yield a conviction of voluntary manslaughter"; (2) it was not manifestly unreasonable for defense counsel to conclude that arguing reasonable provocation in the alternative "would have diminished the force of his claim of self-defense";[6] and (3) the evidence of excessive use of force in self-defense was stronger than the evidence of reasonable provocation.  Id. at 844.

Similar reasoning applies in this case.  Here too, it was reasonable for defense counsel to focus the jury on a theory of self-defense because a successful claim of self-defense would have resulted in an acquittal.  It was also not manifestly

---

[6] Defense counsel had initially requested that the trial judge give a reasonable provocation instruction but withdrew his request the next day, explaining that it could "be counter productive to [his] argument that the defendant acted in self-defense."  Glover, 459 Mass. at 840.

10

unreasonable for defense counsel to conclude that the "mere words" language in the reasonable provocation instruction might have distracted the jury from the claim of self-defense. This is especially so where the defendant's case relied heavily on the alleged threats made by the victim and, as defense counsel noted at the evidentiary hearing, the victim was unarmed and there was no "sudden combat" leading up to the shooting. Finally, although the evidence of excessive use of force in self-defense was not necessarily stronger than the evidence of reasonable provocation, the evidence of both theories was meager. The jury could have viewed the defendant's testimony that he fired the shots because his "body was on autopilot" as inconsistent with a theory that he acted in the heat of passion. See Glover, 459 Mass. at 842 ("a defendant's cool calculation in the face of danger may defeat a theory of reasonable provocation but may still permit a theory of excessive use of force in self-defense"). For these reasons the motion judge properly concluded that it was not manifestly unreasonable for defense counsel to forgo an instruction on voluntary manslaughter based on reasonable provocation.

b. Failure to offer evidence. The defendant contends that defense counsel was also ineffective because he failed to offer various pieces of favorable evidence. The motion judge rejected each of the defendant's claims on the ground that the omissions

11

did not deprive the defendant of a substantial ground of defense. We discern no abuse of discretion.

The defendant first challenges defense counsel's cross-examination of Marshall, arguing that he should have elicited the following additional statements:  that Marshall observed Buckmire-James walking back and forth from the restaurant, saying "he's gonna get him" and "he's about to get him"; and that Marshall overheard the victim say to the defendant, "[Y]ou know what it is, you are a snitch, you know what is supposed to happen to you."[7]  But these statements would have been cumulative of the testimony that Marshall did give, which was already favorable to the defense.  Failing to offer cumulative evidence is not ineffective assistance of counsel.  See Commonwealth v. Britt, 465 Mass. 87, 94 (2013).

The defendant next argues that defense counsel should have elicited from Boston Police Detectives Melvin Ruiz and Carolyn Sygiel that there was evidence that the defendant had in fact "snitched" on the victim in connection with the 2008 case.  This would not have been significant, however.  What was important, and what was uncontroverted at trial, was that the victim believed that the defendant had "snitched" on him.  Moreover, the testimony would have been harmful to the defense because it

---

[7] Marshall made these statements to the police and before the grand jury.

12

would have contradicted the defendant's own testimony that he was "not a snitch." Defense counsel was therefore not ineffective for failing to elicit this evidence. See Commonwealth v. Saladin, 73 Mass. App. Ct. 416, 421 (2008).

Nor was defense counsel ineffective for failing to elicit testimony from a neighbor that she saw the victim emerge from behind the defendant's girlfriend's house a few nights before the murder. The neighbor testified at the evidentiary hearing that she did not have any conversation with the defendant about what she saw. Thus, this evidence would not have been relevant to the defendant's state of mind. As the defendant articulates no other reason why the evidence would have been relevant, he has failed to show that defense counsel was ineffective. See Saladin, 73 Mass. App. Ct. at 421.

Finally, the defendant contends that defense counsel should have offered evidence of the victim's 2005 and 2011 firearms convictions and called the defendant's probation officer and cousin to testify that the defendant told them he was afraid in the days leading up to the victim's release from prison. The defendant claims that all of this evidence would have been relevant to his state of mind. But as defense counsel testified at the evidentiary hearing, he decided not to call the probation officer and cousin as witnesses because he believed that their testimony "would have been a little bit cumulative" of the other

13

state-of-mind evidence, including the defendant's anticipated testimony about "his first-hand fear."  This did not constitute ineffective assistance.  See Britt, 465 Mass. at 94.  With regard to the victim's firearms convictions, defense counsel's affidavit does not address that issue, nor was he asked about it at the evidentiary hearing.  As a result, we do not know whether he made a tactical choice not to offer the evidence, which would also have been largely cumulative of the other state-of-mind evidence.  The defendant has thus failed to demonstrate ineffective assistance on this basis.

2.  Arguments on direct appeal.  a.  Testimony on postarrest silence.  After the defendant was arrested in Alabama, Detectives Ruiz and Sygiel traveled to Alabama and met with the defendant in jail.  During that meeting the defendant told the detectives that they should look into his 2008 case and that "there was more to the story."  At trial, in response to questions from the prosecutor, each detective testified that they told the defendant they would investigate any information he provided either directly or through his attorney.[8]  The

---

[8] Specifically, Ruiz gave an affirmative response to the question -- "[D]id you . . . inform [the defendant] that you would look into any information that he wished to provide either directly or through an attorney?" -- and Sygiel testified that she told the defendant that "this being such a serious charge, that if he had any information to investigate, anything that we don't know, . . . if he could provide some information to his attorney that would be fine and we would look into everything."

14

prosecutor also asked the defendant on cross-examination to confirm that the only information he gave the detectives was that they should look into the 2008 case, despite their giving him "the opportunity, if there was anything [he] wanted to pass alon[g] to do that."  The defendant responded affirmatively.

The defendant argues that this testimony was improper because it constituted comment on his postarrest silence, entitling him to a new trial.  We are unpersuaded.  It is of course true that evidence of a defendant's postarrest silence "cannot be used for the substantive purpose of permitting an inference of guilt" or "for the purpose of impeaching an exculpatory story."  Commonwealth v. Mahdi, 388 Mass. 679, 694 (1983).  But in some situations, "evidence of silence is properly admitted because it is not 'used against' the accused."  Commonwealth v. Waite, 422 Mass. 792, 798 (1996).  For instance, evidence of silence can be used to "explain[] why a police interview of the defendant abruptly ended and the jury would be confused without the explanation," to "rebut[] the defendant's suggestion at trial that some impropriety on the part of the police prevented him from completing his statement to them," or to "rebut[] a claim by the defendant that he had given the police at the time of his arrest the same exculpatory explanation as he was presenting to the jury at trial."  Commonwealth v. Letkowski, 469 Mass. 603, 611-612 (2014).

15

Here, the challenged testimony, viewed in context, did not constitute "use of the defendant's silence against him." Waite, 422 Mass. at 798. Rather, the testimony served to explain the course of the police investigation, in light of the defendant's comment to the detectives that "there was more to the story." Even assuming error, moreover, we conclude that it was harmless beyond a reasonable doubt.[9] Although the defendant claims he was prejudiced because the testimony suggested to the jury that the police had correctly charged him with the murder, we see no prejudice in this respect because the defendant did not dispute that he was the person who shot the victim. We also see no support for the defendant's assertion that the prosecutor sought to convey to the jury that the defendant's silence was a reason not to credit his testimony. Furthermore, the trial judge gave the following limiting instruction during Ruiz's testimony: "[O]f course, no person in custody is obligated in any way under our constitution here in Massachusetts or the U.S. Constitution, to say anything to the police. So please understand [that the defendant] was under no obligation to say anything to the police at this time." We conclude that any error was harmless in these

_____

[9] The parties agree that the objection was preserved and that our standard of review is therefore harmless beyond a reasonable doubt. We will assume, without deciding, that this is correct.

16

circumstances.  See Commonwealth v. Peixoto, 430 Mass. 654, 660-661 (2000).

b.  Excited utterance.  Over the defendant's objection, an officer testified that Buckmire-James told him in the aftermath of the shooting that the person he believed to be the shooter was standing on the porch and "[a]t one point . . . went inside the house to grab a firearm."  The trial judge admitted the statement under the excited utterance exception to the hearsay rule.  In response to the defendant's assertion that the statement was speculative because Buckmire-James did not actually see the person with a weapon, the judge stated that "that goes to the weight that the jury gives to Mr. Buckmire-James'[s] statement as to, whether or not, he came out with a gun."

On appeal the defendant does not challenge the judge's finding that Buckmire-James's statement qualified as an excited utterance, but argues that the judge should still have excluded the statement as speculative.  "As with any other witness," a declarant making a statement under the influence of an exciting event "must have personal knowledge of the event in question, and must be competent" for the statement to be admissible.  Commonwealth v. King, 436 Mass. 252, 255 (2002).  See Commonwealth v. Crawford, 417 Mass. 358, 363 (1994), S.C., 430 Mass. 683 (2000) ("when an extrajudicial statement is offered in

17

court for its truth, the proponent of the statement may be required to establish that the declarant had personal knowledge of the information contained in the statement"); Mass. G. Evid. § 602 note (2024) ("The personal-knowledge requirement also applies to hearsay declarants").  Here, the Commonwealth conceded to the judge that Buckmire-James did not see the person on the porch come out of the house with a weapon.  We thus agree with the defendant that the portion of the statement describing why the person went into the house should have been excluded for lack of personal knowledge.  Cf. Crawford, supra at 363-364 (where it could "be inferred from [the declarant's] statement . . . that she was present in the apartment during the shooting, and at least overheard the event, even if she did not see it," no error in admitting statement as excited utterance).

The admission of the statement did not cause the defendant any prejudice, however.  Buckmire-James testified at trial and was available for cross-examination about the statement.  That proved unnecessary, however, because Buckmire-James testified during direct examination that he never saw the person on the porch with a weapon.  In light of this testimony, we can say with fair assurance that the error did not influence the jury. See Commonwealth v. Canty, 466 Mass. 535, 544-545 (2013).

Judgments affirmed.

18

<u>Order denying motion for new trial affirmed</u>.

By the Court (Shin, Ditkoff & Brennan, JJ.[10]),

*Paul Little*

Clerk

Entered:  October 21, 2024.

---

[10] The panelists are listed in order of seniority.