COMMONWEALTH vs. PRESTON LEE GILBERT.

Middlesex. November 7, 1996. - December 6, 1996.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & MARSHALL, JJ.

*Homicide. Malice. Practice, Criminal,* Required finding, Argument by prosecutor, Capital case. *Evidence,* Relevancy and materiality, Hearsay, Spontaneous utterance.

Evidence at the trial of a first degree murder indictment was sufficient to permit a rational jury to find beyond a reasonable doubt that the defendant had committed murder with deliberately premeditated malice aforethought. [868-870]

At a murder trial the judge properly excluded certain evidence as lacking relevance [870-871], correctly excluded other documentary evidence as inadmissible hearsay [871], and properly excluded a statement of the defendant, offered as a spontaneous utterance, which lacked the spontaneity that would have negated possible fabrication. [871]

At a murder trial, certain of the prosecutor's remarks in final argument, considered in context, were not improper and were supported by the evidence; further, the judge's thorough instruction on the issue dissipated any extraevidentiary force the comments might have had. [871-873]

INDICTMENT found and returned in the Superior Court Department on January 17, 1991.

The case was tried before *Elizabeth J. Dolan,* J.

*Mark R. Wetmore* for the defendant.

*Peter E. Schlossman,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree on the ground of deliberate premeditation. Represented by new counsel on appeal, the defendant argues that the judge erred in denying his motion for a required finding of not guilty, filed at the end of the Commonwealth's case and renewed at the conclusion of the trial. The defendant also argues that the judge erred in three instances in excluding evidence and that the prosecutor's closing argument contained improper and prejudicial remarks. If these claims are rejected, the defendant asks that we

exercise our power under G. L. c. 278, § 33E (1994 ed.), to grant him relief. We affirm the judgment and decline to exercise our power under G. L. c. 278, § 33E.

We summarize the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Cordle*, 404 Mass. 733, 734 (1989), *S.C.*, 412 Mass. 172 (1992). On January 7, 1991, Somerville police responded to a telephone call from the defendant, asking for police to come to his apartment at 15 Weston Avenue in Somerville, because of a woman who was not breathing. When the Somerville police arrived, they found the victim, Lana Gilbert, lying on a couch in a fetal position, covered by a blanket. They requested assistance from the Somerville fire department and paramedics and proceeded to perform cardiopulmonary resuscitation (CPR) on the victim, who showed no signs of life. The officers moved the victim to the floor of the apartment and discovered that she was naked under the blanket. They noticed that her head and lips were cut, her tongue bloodied, and that her arms and legs were bruised. One of the police officers questioned the defendant about what had happened. The defendant told police that the victim had hit her head on the bathroom sink and also had taken some medication.

Firefighters from the Somerville fire department arrived at the apartment shortly after the police officers and continued CPR on the victim, who continued to show no signs of life. The firefighters administered oxygen to the victim and continued CPR until they were replaced by paramedics from the city's ambulance service. The firefighters also noticed that the victim's lips were cut and that she had bruises on her legs, and that the defendant was carrying a cane.

The paramedics inserted a tube into the victim's mouth and down her windpipe to assist her in breathing and administered drugs to attempt to "goad the heart into action." This drug therapy produced a "transient" pulse, which was sustained for a brief period before it ceased. At no time did any of the police, firefighters, or paramedics observe anyone touch or kneel on the victim's abdomen or exert any pressure on her neck other than the light touch necessary to determine whether she had a pulse.

The victim was transported to Somerville Hospital, where an emergency room nurse observed lacerations on her face and lip and bruises on her arms and legs. The victim showed

no signs of life and was pronounced dead about one half-hour after her arrival at the hospital. In a subsequent autopsy, the Commonwealth's chief medical examiner, a forensic pathologist, determined that the victim had died of blunt neck trauma, which involved severe hemorrhages to her carotid arteries caused by blows or forceful pushes from thumbs, fingers, or a rounded edge. These injuries were characterized as the result of a force "similar to . . . neck strangulation." In addition, the autopsy showed evidence of hemorrhage in the wall of the duodenum, an injury that could only have resulted from violent force on the victim's abdomen, such as if she had been kicked or kneed or had fallen from some height. The medical examiner further concluded that the bruises on her lip, arms, and legs were linear, that the injuries on her arms were in the nature of defensive wounds, and that these injuries were consistent with those inflicted by a blunt object such as a cane.

Detectives from the Somerville police department interviewed the defendant on the evening of January 7 at his apartment. The defendant told the police that he lived at the apartment with the victim, who had been his girl friend for fifteen years and who had taken his last name. The defendant told police that he had been away from the apartment, staying at the home of his ex-wife, and had returned Sunday evening around 10 P.M. in the company of his daughter and son-in-law. When he came back to his apartment on Sunday evening, he found the victim "all doped up" and speaking with slurred speech. The victim told the defendant she had taken "over a hundred Tylenol," but refused his offer to take her to the hospital. The defendant noticed a cut on the victim's lip, and when he asked her about the source of that injury, she said she had fallen in the bathroom. The defendant said he went to sleep on Sunday evening and the next day he went out to run errands at noon. When he returned to the apartment at about 2:15 P.M., he found the victim sitting on the couch, naked, with her head near her knees, complaining of a burning fever. The defendant noticed that she was breathing loudly and that her speech was slurred. He helped her lie down on the couch and covered her with a blanket. Later in the day, the defendant noticed that the victim had stopped breathing, and he then called police.

A Somerville detective then searched the defendant's apart-

ment with the defendant's consent. The detective found a three-page letter dated January 5, 1991, addressed to a mutual acquaintance of the couple. The letter had been ripped in half and was later identified as having been written by the victim. When the detective showed the letter to the defendant, he admitted to having a sexual affair with the woman to whom the letter was addressed and explained that he had told the victim about the affair and that the couple had fought about it earlier in the week but that the victim had forgiven him.[1]

On January 9 and 11, 1991, the defendant was again interviewed by a Somerville detective and a police officer. In these interviews, the defendant repeated the information he had told police on the night of the victim's death. The defendant's version of the events of Monday afternoon and evening as recited in these two interviews differed from the story he had initially told police on the evening of the victim's death. In the later interviews, the defendant admitted that his first telephone call had not been to police, but that instead he had first called the victim's cousin, who had directed him to call the police. In his interview the night of the victim's death, the defendant said he had seen bruises on the victim on Sunday evening, but in later interviews, he denied seeing any bruises until Monday afternoon. The defendant also seemed unsure about the time span between his return home and his awareness that the victim had ceased breathing, indicating in the first interview that he had returned home but had not noticed that she had stopped breathing until 7 P.M., but in the second and third interviews recalled that he had returned home at about 2:15 P.M. and shortly afterward had noticed she had stopped breathing and called police.

In the interviews on January 9 and 11, the defendant described for the police in greater detail his activities the day before the victim's death. On his return to the apartment on Sunday evening, the defendant found the victim lying on the couch, breathing heavily. Her speech was slurred. The defendant saw pill bottles and the victim told the defendant she had taken some medication, but she refused the defendant's offer to take her to the hospital. The defendant's daughter gave the victim a bath, and later she fell asleep on the couch.

---

[1] The woman with whom the defendant claimed to have had an affair testified at trial that she never had had a sexual relationship with the defendant.

The defendant said that he and the victim had not had any serious fights or problems in their relationship, and he denied ever striking her. The defendant told police that he and the victim were the only individuals with keys to the apartment and that the only other people present in the apartment between January 4, and January 7, were his daughter and son-in-law.

The defendant acknowledged in his interviews with police that, on January 2, he had been involved in a violent fight with his sons at the apartment and that the victim, upset about the resulting damage to the apartment and its furnishings, had called the police. This fight set into motion a chain of events between the defendant, the victim, and the Somerville Housing Authority, from whom the defendant leased his apartment. The manager of the housing authority testified that, on January 3, the day after the fight between the defendant and his sons, the defendant called her to complain that "his housekeeper" was threatening to remove a color television from the apartment. The manager took steps to remove the victim from the apartment[2] and later met with her. At their meeting, the victim informed the manager that she had been helping the defendant pay the rent on the apartment, that she had lived in the apartment with the defendant from the time he had moved there, and that she intended to leave him. The victim also provided information concerning her income to the manager. Based on this information, the manager sent a notice to the defendant requiring him to attend a "private conference" to discuss the disturbance in the apartment and the need to adjust his rent to reflect this additional unreported income.

That same day, the defendant also called the director of public safety at the housing authority, who testified that the defendant told her he was "having some problems" with his girl friend and was afraid that she would remove his expensive television set. The manager directed the defendant to seek a restraining order. Later that day, a Somerville police officer was sent to the apartment building with instructions to

---

[2] The rental payments for apartments managed by the housing authority are based on the income of the individuals who apply to live there. The housing authority was not aware that the victim was living in the defendant's apartment with him; the defendant's name was the only name on the lease.

remove an "unwanted female guest" from the defendant's apartment. When the police officer told the victim that she would have to leave the apartment, she called the defendant a "no good alcoholic" and stormed out, complaining to a neighbor that the defendant was kicking her out.

1. The defendant argues that this evidence, viewed in the light most favorable to the Commonwealth, and considered with all permissible inferences, is insufficient to establish his guilt beyond a reasonable doubt. We do not agree.

"[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). See Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). The question of guilt cannot be left to conjecture or surmise. *Commonwealth* v. *Anderson*, 396 Mass. 306, 312 (1985). Mere opportunity to commit the crime or presence at the scene is insufficient without other evidence. *Commonwealth* v. *Cordle*, 404 Mass. 733, 742 (1989), and cases cited. However, circumstantial evidence is competent to establish guilt beyond a reasonable doubt. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986). An inference drawn from circumstantial evidence "need only be reasonable and possible; it need not be necessary or inescapable." *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). We conclude that the Commonwealth's evidence was sufficient to permit a rational jury to find beyond a reasonable doubt that the defendant had committed murder in the first degree: murder committed with deliberately premeditated malice aforethought.

From the medical examiner's report and testimony, the jury reasonably could have concluded that the victim had been beaten and that her death had occurred within a few minutes after she sustained the injuries to her carotid arteries that caused them to hemorrhage. The victim's posture, both at the time the defendant returned home at about 2:15 P.M. on the day of her death and when the police officers entered the apartment (i.e., bent over with head between her legs; fetal position) was consistent with someone who had suffered severe abdominal trauma. The jury could have concluded that the bruises on her arms were defensive wounds suffered

in a beating, and that those bruises, and the bruises on her legs, had been caused by the defendant's cane. Although the defendant suggested in his interviews with police that the victim had committed suicide by taking an overdose of medication, the medical examiner did not find any evidence of acetaminophen (Tylenol) or salicylate (aspirin) poisoning during the autopsy. The Commonwealth therefore presented sufficient evidence to allow the jury to conclude that the victim had been murdered and did not commit suicide.

The defendant denied that he and the victim were having difficulties in their relationship, but the interactions between the defendant and the housing authority substantially undercut this assertion. The victim was clearly upset by the fight involving the defendant's sons and the resulting damage to the apartment and its furnishings. The jury could reasonably have inferred that this situation had led to a dispute and ultimately to the attempt by the defendant to have the victim removed from his apartment as an "unwanted guest." The jury could also have found that the victim's knowledge of the confessed affair, as evidenced by the torn letter found after her death, contributed to the ill will between the two. Further, the jury could have found that the defendant became aware that the victim had reported her presence and contribution to household income to the housing authority, jeopardizing his continued occupancy of the apartment, and that this served to aggravate an already tense situation to the point where tempers flared and the defendant struck the victim with his cane. The jury therefore could reasonably have found that these incidents were sufficient to establish malice. See *Commonwealth* v. *Scanlon*, 373 Mass. 11, 18 (1977). The jury also could have reasonably inferred that the inconsistencies in the defendant's various versions of the events, together with his repeated denial that there were any serious difficulties between the couple in the face of consistent evidence to the contrary, were evidence of the defendant's consciousness of guilt that could be weighed against him. *Commonwealth* v. *Cordle, supra* at 741.

Finally, the defendant was the only individual in the apartment at the time of the victim's death. Although he told the police that he had not hit the victim, her death was caused by injuries consistent with being beaten by a cane, punched or kicked, and strangled, and the medical examiner's report

indicated that she could only have survived a few minutes after the fatal assault to her neck. No one except the defendant and the victim was in the apartment between Sunday evening and the time the police were called on Monday night. The jury could reasonably conclude from all the Commonwealth's evidence that the defendant had the exclusive motive and opportunity to inflict these injuries and was responsible for the victim's death. We therefore conclude that there was sufficient evidence in the Commonwealth's case from which the jury could have concluded that the defendant was guilty as charged.[3]

2. The defendant argues that on three occasions the judge improperly excluded evidence that was important to his defense. We conclude that each piece of evidence was correctly excluded.

(a) The first evidence concerned testimony by the owner of a temporary placement service. The victim had registered with the service and had worked at four different assignments. The defendant's trial counsel attempted to elicit from the owner that on January 3, 1991, about four days before her death, the victim "declined to commit" when she was offered a long-term job. The defendant contends that the evidence should have been admitted to show that the victim turned down a job offer because she was contemplating suicide.

---

[3] Through cross-examination of the witnesses in the Commonwealth's case, the defendant introduced evidence that the victim may have committed suicide by taking an overdose of medication. This evidence, however, went to the weight and credibility of the Commonwealth's case, and consequently presented issues for the jury to decide.

The Commonwealth's evidence did not deteriorate after the defense presented its case. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976). In the defense case, the defendant built on his contention that the victim had not been murdered by introducing evidence from a New Jersey medical examiner, who testified that the bruises on the victim were as much as five days old and that the victim had died from "synergistic intoxication" caused by an overdose of salicylate (aspirin) and acetaminophen (Tylenol). This doctor also contradicted certain other conclusions reached by the Commonwealth's medical expert. This evidence, which posited an alternative theory for the victim's death, does not furnish a basis for the grant of a motion for a required finding. See *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80 n.5 (1978). The case was for the jury to decide on all the evidence, including the conflicting medical testimony as to the cause of death.

The proposed testimony was equivocal at best. The victim's conversation about the job occurred about one hour after she had been removed from the apartment and close in time to her decisions to leave the defendant and to disclose her contribution of household income to the housing authority. The victim's declination also did not express a permanent refusal of the job offer. The judge properly concluded that the evidence was too attenuated and lacked relevance, and, as such, the judge acted within her discretion in excluding it. See *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990).

(b) The second item of evidence was a six-page report dated April 5, 1987, entitled "Pain Management Program," which was apparently written by a social worker who had spoken with the defendant and the victim. The defendant maintains that the report was relevant because it corroborated details that the defendant had provided to the police concerning the couple's lifestyle and the defendant's interaction with the victim on the afternoon of her death.

The judge properly excluded the report as inadmissible hearsay, which, although it was referred to as part of a hospital record, was not offered in a manner consistent with the requirements of G. L. c. 233, § 79 (1994 ed.). The report could also be considered irrelevant because it was prepared almost four years before the victim's death. See *Commonwealth* v. *Palmariello*, 392 Mass. 126, 136-137 (1984).

(c) The third occasion involved testimony by a nurse that the defendant told her on January 8, 1991, the day after the victim's death, that "my wife killed herself last night." The defendant contends that the testimony constituted a spontaneous utterance that supported his defense. The judge properly excluded the evidence because the defendant's statement to her was properly excluded because his statement was lacking the spontaneity that would have negated possible fabrication. See *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994).

3. There was evidence that the victim was missing some of her front teeth and that, after her death, she had a linear mark from the upper part of her lip down to her chin. There was also testimony that the defendant had told the police that the victim had spoken in a slurred voice prior to her death. The prosecutor cross-examined the defendant concerning whether the victim's slurred speech might have resulted from her missing teeth and the injury to her mouth. In his closing

argument, the prosecutor asked the jury rhetorically: "And do you think the [victim's] slurred speech might have something to do with her missing some of her teeth?" The defendant's trial counsel objected to this statement, and the judge indicated that she would "take care of that." The prosecutor then stated to the jury: "And I would ask you to consider, when you consider the slurred speech that [the defendant] says he heard that night, because she might be drunk, but she doesn't drink. The missing of the front teeth. Her lip being smashed with a linear laceration." At the conclusion of the prosecutor's closing argument, the judge gave the instruction set forth below.[4] The defendant now argues that the prosecutor's closing remarks were improper and prejudicial to the point that a new trial is required because the remarks suggested to the jury that the defendant had knocked out the victim's front teeth. We do not agree.

The remarks, considered in context, do not appear improper. They apparently were made to suggest that the defendant had exaggerated the victim's propensity to drink alcohol, when her slurred speech might have been caused by

[4] "Jurors, just to set one error straight, and I do not feel that the jurors have, indeed, taken anything and misconstrued it. [Defense counsel] objected during [the prosecutor's] closing with regard to missing front teeth. The Commonwealth to my notes and my recollection has not suggested at any time that any teeth were lost during this event. It is simply, and I think there was testimony that the teeth were missing but were missing over a period of time, and I understand that the Commonwealth has not suggested that is part of their case, that somehow teeth were knocked out, broken, or anything else, and that the questions as posed, as I understood them to be, is whether or not the missing [teeth] in combination with any other condition would contribute to slurred speech. So that's not an implication that any missing teeth somehow, and I think [defense counsel] is concerned that that may have been left with the jury. As I recall that was never postulated by the Commonwealth. And if anyone thought that, then dismiss it. . . . [T]here was another time when the question was asked about the missing front teeth and the incisor, and again, it wasn't suggesting that the teeth were missing as a result of any event on the 7th, but whether or not, being one of the teeth next to the two front teeth, I believe, and coming into play with a hard object would have left a line mark, and I think that was the nature of the question at that time.

"So it occurred twice during the thing, and once during the closing. If that is the concern of the defense, put it to rest. It has not been a suggestion of the Commonwealth that teeth were missing as a result of what had happened during those occasions. If that's in your mind, put it out. But I suggest that they did not put any evidence forward to indicate that in any event."

her missing teeth. The evidence tended to support the latter interpretation. In any event, the judge's thorough instruction on the issue dissipated any extraevidentiary force that the comments might have had and was sufficient to deal with the defendant's concern.

4. We have considered the defendant's assertion that he is entitled to relief pursuant to G. L. c. 278, § 33E. The verdict is supported by the evidence and the law, and the interests of justice do not call for a new trial or the entry of a lesser degree of guilt. *Commonwealth* v. *Cook*, 419 Mass. 192, 208 (1994).

*Judgment affirmed.*