COMMONWEALTH *vs.* ROBERT DUNN.

No. 00-P-1645.

Middlesex. December 18, 2001. - September 26, 2002.

Present: GREENBERG, CYPHER, & McHUGH, JJ.

*Evidence,* Spontaneous utterance, Cumulative evidence.

The judge at a criminal trial erred in admitting, under the excited utterance
    exception to the hearsay rule, statements made during a complaining
    witness's execution of a preconceived plan to have the defendant arrested;
    however, where the statements were merely cumulative of other properly
    admitted evidence and contributed nothing substantial to the defendant's
    conviction, the error was harmless. [92-95]

INDICTMENT found and returned in the Superior Court Department on December 3, 1998.

The case was tried before *Maria I. Lopez,* J.

*Frances I. Tucker* for the defendant.

*Sheryl F. Grant,* Assistant District Attorney, for the Commonwealth.

McHUGH, J. Once again, we face questions about the admissibility of "excited utterances" or "spontaneous declarations." In this case, the statements were made during the complaining witness's execution of a preconceived plan to have the defendant arrested and, therefore, they should not have been admitted. The defendant seasonably objected. Nevertheless, having reviewed the entire record, we can say with a fair degree of assurance that admission of the statements contributed nothing substantial to the defendant's conviction. See *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994). We therefore affirm.

Because the trial judge's ruling on the admissibility of evidence is conclusive if there is evidence to support that ruling, *Fauci* v. *Mulready,* 337 Mass. 532, 540 (1958), we review the record to see what evidence supported admission of the

statements at issue. When we do, we find evidence to the following effect.[1] The defendant had a troubled relationship with Jill Jones,[2] the complaining witness. The pair lived with Jones's young son in a Lowell apartment she rented with the help of a subsidy procured through an organization known as Community Teamwork, Incorporated, or CTI, whose role in the succeeding events will become clear momentarily.

At some point between July 12 and 17, 1998, the defendant beat Jones, ripped off her clothing and threatened her with a knife. Jones made no contemporaneous report of the incident[3] and remained living with the defendant in the apartment. She did not, however, feel safe in doing so.

About two weeks later, in the early morning hours of July 29, 1998, the defendant began an argument with Jones over inconsequentials. The argument escalated to violence, and the defendant punched Jones in the face some ten to fifteen times while straddling her on the bed they shared. He eventually stopped the beating, and they both fell asleep.

Later that morning, Jones awoke in a state of fright and confusion. The defendant left the apartment for about one and one-half hours, at least part of which time was spent taking Jones's young son to a day care center. While the defendant was out, Jones telephoned her mother and her in-laws in an effort to plan a getaway from the defendant during the upcoming weekend. She gave neither of them any details about what had happened to her, fearing that they might call the police before she and her son could escape the defendant's control.

The defendant was in and out of the apartment all day. At one point, he grabbed the phone from Jones's hand to see who was on the other end. She was too frightened to vacate the apartment that day but she did form a plan to do so. In her own words, the plan had two components. The first component,

---

[1] That the jury may ultimately have disbelieved that evidence is irrelevant to the question whether the evidence existed and provided a foundation for admission of the contested statements. The admissibility of evidence, after all, cannot turn on the trial's outcome.

[2] A pseudonym.

[3] At trial, Jones said that she had not reported the incident to the police because she feared that they would not detain the defendant long enough for her to get away from him safely.

formed with the help of her mother, was to rent a U-Haul truck and, with her father's assistance, remove her belongings from the apartment during the weekend. The second component involved a trip to the CTI offices ostensibly to deliver some pay stubs CTI needed to send to funding authorities so that her housing subsidy would continue. From the witness stand, she explained the plan's second component in the following fashion:

> "Well, as I planned on moving on the weekend, Saturday, my son wasn't going to be there but I was worried about that situation, I didn't know how [the defendant] would react. I didn't know if I could get him away from the house long enough.
>
> "So I figured if I do go to CTI, have the police called . . . because he did abuse me and I did have a black eye at the time, that he would get locked up for a certain amount of hours. And during that time that he was locked up, I could get the U-Haul and I could move my things out and go back home."

In accordance with her plan, on the following day, July 30, the defendant, Jones, and her son bicycled to the CTI offices. Jones and the youngster went inside while the defendant stayed outside to guard the bicycles. Inside the office, Jones encountered Deborah Gagne, the CTI employee responsible for housing subsidies. To Gagne, Jones appeared hysterical. She was crying and shaking. Her right eye was badly bruised. When she got inside Gagne's office, she immediately asked her to lock the door, pull the shades, and call the police. She then described the punches the defendant had delivered some thirty hours earlier.

Gagne or an associate called the police and Detective Christopher Finneral promptly responded. When he saw Jones in Gagne's office, she was crying and shaking. She told him that the defendant had punched her, explained how much she feared the defendant, and described her escape plan. Detective Finneral photographed Jones. He then left the CTI offices, found the defendant standing guard over the bicycles, and arrested him. Jones moved out of the apartment that night.

The defendant was subsequently indicted for offenses arising

out of the first and second incidents, i.e., kidnapping, assault and battery (two counts), threats (two counts), and assault and battery by means of a dangerous weapon (two counts). When the case came to trial and before any evidence was taken, the Commonwealth moved to admit Jones's statement to Detective Finneral as a spontaneous declaration or excited utterance and claimed that the alleged kidnapping on July 29 was the exciting event. Over the defendant's objection, the motion was allowed. The defendant renewed his objection as Detective Finneral's testimony was offered. The objection was overruled, and Detective Finneral testified regarding what Jones said to him. The same procedure was followed before and during Gagne's testimony. The jury ultimately convicted the defendant of assault and battery on July 29 and acquitted him of all other charges.

Jones's statements to Detective Finneral and to Gagne were not spontaneous declarations or excited utterances. Neither witness should have been permitted to testify about the content of those statements. In its most recent description of an excited utterance or spontaneous declaration, the Supreme Judicial Court said:

> "A spontaneous utterance will be admitted in evidence if (1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the result of reflective thought.' "

*Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002), quoting from 2 McCormick, Evidence § 272, at 204 (5th ed. 1999).

The elements set out in *Santiago* are functionally related. Although "[t]here can be no definite and fixed limit of time" beyond which the exciting event's influence dissipates as a matter of law, *Rocco* v. *Boston-Leader, Inc.*, 340 Mass. 195, 197 (1960), quoting from Wigmore, Evidence § 1750 (3d ed. 1940), and while the trial judge "ought to be given broad discretion" in assessing the admissibility of such evidence, *Commonwealth* v. *DiMonte*, 427 Mass. 233, 236 (1998), the statement in question must have been "spontaneous to a degree which reasonably

negated premeditation or possible fabrication." *Commonwealth* v. *Brown*, 413 Mass. 693, 695 (1992). See generally *Commonwealth* v. *DiMonte*, 427 Mass. at 236-242. The spontaneity requirement flows from a general belief that reflex breeds reliability. *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 222 (1973). *Commonwealth* v. *Carrasquillo*, 54 Mass. App. Ct. 363, 368 (2002). Hughes, Evidence § 569, at 790-791 (1961). Young, Pollets, & Poreda, Evidence § 803.2, at 122 (2d ed. 1998). Accordingly, the exception is unavailable not only when premeditation or fabrication is actually shown but also when the statement's proponent fails to "reasonably negate[]" the presence of either. *Commonwealth* v. *Hardy*, 47 Mass. App. Ct. 679, 685 (1999). See *Commonwealth* v. *Gilbert*, 423 Mass. 863, 871 (1996).

Here, there was ample evidence for the judge to find that Jones was agitated, distraught, and upset by her memory of the violence she recounted and that the violence was the kind of startling event that had the capacity to overwhelm her normal reflective thought processes. But the evidence was equally clear that, notwithstanding the violence's potential impact on Jones's thinking process, Jones in fact made her statements as part of a preconceived plan, components of which she had discussed with her mother, to make a safe exit from the defendant's control; a plan that included having him arrested, and thus incapacitated, while she left the apartment she and the defendant then shared. Therefore, not only was there opportunity for Jones's premeditation and fabrication, there was undeniably premeditation in fact.

The Commonwealth argues here, as it did in the trial court, that the exciting event was the kidnapping it alleged had followed the early morning beating on July 29, and that the event only ended when Jones arrived safely in the CTI office on July 30. Indeed, it appears that the trial judge admitted the statements on that theory.[4] Even if one accepts that theory, however, the uncontroverted fact remains that Jones made her statement

[4]It might seem tempting to analyze admissibility of excited utterances by using the template employed when testing the admissibility of fresh complaints. The temptation should be resisted. Fresh complaints are admitted to dispel an inference of falsehood thought to arise in the absence of a prompt

as a preconceived component of an escape plan and not as an essentially spontaneous reaction to the event itself.

The question remains whether erroneous admission of Detective Finneral's testimony and that of Gagne requires reversal. Because the defendant objected at each instance when their testimony was offered, we review the error to determine whether

> "the conviction is sure that the error did not influence the jury, or had but very slight effect . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected."

*Commonwealth* v. *Flebotte*, 417 Mass. at 353, quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). See *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 n.7 (1999). In that regard, the burden of showing the absence of harm is on the Commonwealth. See *Commonwealth* v. *Hanger*, 377 Mass. 503, 510-511 (1979).

Here, Jones herself testified and told the jury everything that she told Detective Finneral and Gagne. In that sense, the detective's testimony and that of Gagne was cumulative. Generally, "[t]he mistaken admission of hearsay evidence, if merely cumulative of another witness's testimony, does not constitute reversible error." *Commonwealth* v. *O'Connor*, 407 Mass. 663, 670 (1990). Moreover, Jones was subject to cross-examination. See *Commonwealth* v. *Whelton*, 428 Mass. 24, 27 (1998); *Commonwealth* v. *O'Kane*, 53 Mass. App. Ct. 466, 472 (2001). Beyond that, both Detective Finneral and Gagne

"hue and cry." See *Commonwealth* v. *Bailey*, 370 Mass. 388, 392-396 (1976). Because it would be unreasonable to expect a hue and cry while the victim remains in the perpetrator's control, the promptness of the complaint is determined by measuring its temporal distance from the victim's release, not by measuring its distance from the event the complaint describes. See, e.g., *Commonwealth* v. *Comtois*, 399 Mass. 668, 672-673 & n.9 (1987); *Commonwealth* v. *Amirault*, 404 Mass. 221, 229 (1989). Unlike excited utterances, therefore, reflexive spontaneity does not supply the linchpin for admission of fresh complaints. See *Commonwealth* v. *Sherry*, 386 Mass. 682, 691 & n.5 (1982).

testified not only about Jones's statements but also about her demeanor and a bruise to her right eye, and Detective Finneral authenticated a photograph showing the bruise. The photograph, which we have examined, shows a clearly blackened right eye, with deep discoloration on the eyelid and on the skin below the eye itself.

The defendant did not testify. He did call a police officer whose testimony the jury could have found contradicted testimony Jones had given on a material point regarding the first, but not the second, of the two beatings to which she testified.

Apart from the improperly admitted statements, the Commonwealth's case on the July 29 assault and battery thus consisted of Jones's testimony, the testimony of Detective Finneral and Gagne regarding their observations of Jones's eye and her demeanor, and the powerfully corroborating photograph. That was a very solid case. It was not, to be sure, an invincible case but few are. It was sufficient, however, for us to say "with fair assurance . . . that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. at 353. The judgment of conviction must therefore be affirmed.[5]

*So ordered.*

---

[5]In this direct appeal, the defendant argues that his counsel was ineffective for having failed to call certain witnesses. In support of the claim, the defendant improperly submitted an affidavit to this court for the first time on appeal. Such a claim is "best left for resolution in the first instance by the trial judge on a motion for new trial." *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 344 (1994), quoting from *Gibney* v. *Commonwealth*, 375 Mass. 146, 148 (1978). The defendant may present his claim of ineffective assistance of counsel by way of a motion for new trial. *Commonwealth* v. *Adamides, supra* at 345.