## Commonwealth *vs.* Rafael Moquette.

Suffolk. March 3, 2003. - July 10, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Evidence,* Spontaneous utterance, Corroborative evidence, Prior inconsistent statement.

At a trial of a complaint charging assault and battery by means of a dangerous weapon (a belt), assault and battery, and violation of a protective order, evidence consisting of excited utterances made at the scene of the assault which the declarants later recanted at trial, sufficed, without any corroboration, to support the defendant's conviction of assault and battery by means of a dangerous weapon, where the jury were free to determine what weight to give that substantive evidence. [700-708]

Complaint received and sworn to in the Roxbury Division of the District Court Department on October 21, 1998.

The case was tried before *R. Peter Anderson,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Rami M. Vanegas,* Assistant District Attorney, for the Commonwealth.

*Astrid H. afKlinteberg* for the defendant.

The following submitted briefs for amici curiae:

*Nona E. Walker,* Committee for Public Counsel Services, for Committee for Public Counsel Services.

*William M. Bennett,* District Attorney, *Jane Davidson Montori & Katherine E. McMahon,* Assistant District Attorneys, for the District Attorney for the Hampden District & others.

Sosman, J. The defendant was convicted of assault and battery by means of a dangerous weapon (two counts), assault and battery, and violation of a protective order in connection with an incident of domestic violence against his girl friend and her two children. On appeal, the Appeals Court reversed the conviction with respect to one count of assault and battery by means

of a dangerous weapon, and affirmed the remaining convictions. *Commonwealth* v. *Moquette*, 53 Mass. App. Ct. 615, 625 (2002). In reversing that one conviction, the Appeals Court held that the evidence was insufficient because the Commonwealth's case relied entirely on spontaneous utterances made at the scene, later recanted by the declarants at trial, without any corroboration that the striking of the child victim described in the spontaneous utterances had occurred. *Id.* at 619-623. We granted the Commonwealth's application for further appellate review, and we now affirm the conviction.

1. *Facts.* At approximately 4:30 A.M. on August 17, 1997, security officers at a housing project in the Roxbury section of Boston observed a woman and a boy run out of one of the apartment buildings. The woman, Rosaline Motero, was clad only in her nightgown. She appeared "really shaken up, scared." The boy, Motero's nine year old son, Joel, was crying. He told the officers that his "father"[1] had hit his mother, himself, and his sister and that they had fled the apartment in fear. The defendant ran outside a few minutes later, knife in hand, and was quickly apprehended.

After the defendant was handcuffed, Joel further explained to the security officers that his mother had been fighting with the defendant, that the defendant had hit her twice, and that the defendant had beaten him and his sister with a belt. He said that his sister's hand had been struck with the belt buckle. Joel showed the officer a cut on his right hand, saying that that cut had been caused by the defendant's hitting him with the belt buckle.[2] The officers also observed red marks on Motero's face and neck.

The security officers, one of the Boston police officers who had been called to the scene, Motero, and Joel went inside the apartment, where they found Motero's eleven year old daughter Aneri. Aneri reported to the officers that she and Joel had attempted to intercede in a fight between her mother and the

---

[1] The defendant was Motero's boy friend, and had fathered one of Motero's children. He was sometimes referred to as Joel's stepfather.

[2] The record is unclear precisely when in this sequence of events Joel displayed his cut hand to the officer, but the officer testified unambiguously as to having seen Joel's claimed injury.

defendant. The defendant had taken his belt off and struck both of them with it. She gave the officers the belt in question and displayed marks on her hand and leg that she claimed were caused by the blows with the belt. She stated that Joel had also been hit on the hand and on the leg. During this exchange, Aneri was visibly upset. While Joel had been upset at the time of his initial encounter with the security officers, he became "very withdrawn" and "sullen" when they were back in the apartment, declined to answer questions, and then claimed that he had not been hurt.

An ambulance was summoned, and both of the children were seen by an emergency medical technician (EMT). Aneri explained that she had been injured when the defendant struck her with the belt, and the EMT observed injuries to her left thumb and right thigh. The EMT also examined Joel. Joel told the EMT that he had been struck on his right hand and right lower leg. When Motero was examined, she complained of shoulder and neck pain, but the EMT saw "[n]o visible signs of trauma." These observations and complaints were noted on the ambulance report forms, with a separate form for the examination of each victim. Motero rejected the EMT's offer to have herself and her children transported to the hospital for further evaluation.

At trial, Motero testified that the incident had occurred during a dispute with the defendant about playing loud music that had awoken the children. When the children came out of the bedroom, Motero testified that the defendant "got the belt and he hit them so that they would go to sleep." On cross-examination, she testified three more times to the same effect, i.e., that the defendant had hit "them" with the belt. On redirect examination, she testified that the defendant only "threw" the belt, but again testified that the belt had been thrown "at them," i.e., at both children. Finally, on recross-examination, she was asked, "[H]e never hit Joel with the belt though, did he?," to which she responded, "No." She also testified that Joel had not been examined by the EMT. She further testified that, during the incident, she had tried to telephone security personnel. The defendant had grabbed the telephone from her, striking her unintentionally as he did so, but not hurting her.

At trial, Joel testified that he had come out of his room in response to the loud music and had found his mother and the defendant arguing. When asked whether anything happened to him that night, he responded, "No." He did testify that Aneri had been injured with a belt buckle, but did not say how her injuries had occurred or who had inflicted them. On brief cross-examination, defense counsel asked, "[The defendant] never hit you with a belt that night, did he?" Joel gave "[n]o verbal response" and was excused from the witness stand.

Aneri testified that she had not seen the defendant hit anyone other than herself. When asked specifically whether she remembered anyone else being hit, she gave "[n]o verbal response." On cross-examination, defense counsel asked, "[The defendant] never hit Joel with the belt, did he?" Again, Aneri gave no response. She similarly failed to answer many other questions put to her.

The defendant testified that he had not struck either child, but had only "snapped" the belt in their direction because they had not obeyed his instruction to return to bed. He claimed that Joel returned to bed, but that Aneri was still up. He then "snapped" the belt at her two more times, not intending to hit her with it, but she grabbed at the belt with her left hand on the last snap. He claimed that Aneri's leg injury was due to a fall earlier that night.

2. *Discussion.* The Appeals Court held that the various statements made by the three victims to the security officers, police officers, and the EMT were properly admitted as spontaneous utterances. However, with respect to the charge of assault and battery by means of a dangerous weapon on Joel, the Appeals Court held that the evidence was insufficient to support the conviction because the only evidence of that assault came from the children's spontaneous utterances at the scene, yet the eyewitnesses had all testified at trial that Joel had *not* been struck.[3] *Commonwealth* v. *Moquette,* 53 Mass. App. Ct. 615, 619-620 (2002). Because of the circumstances in which the

---

[3]The factual premise of the Appeals Court's analysis is not quite accurate. Motero testified four separate times that the defendant had hit "them" with the belt, referring to both children. While she later changed her testimony in response to a leading question from defense counsel and testified that the

spontaneous utterances had been made, "[t]he chance for lack of precision or misstatement as to any one part of the incident, or for confusion as to the details of what was said, is obvious." *Id.* at 622. And, because the children testified as to the defendant's commission of other crimes, the Appeals Court was of the view that the children's recantation with respect to the defendant's striking Joel could not have been the product of bias. *Id.* The Appeals Court thus concluded that where a "trial witness, whose extrajudicial statement is admitted as a spontaneous utterance, refutes the accuracy of the reports of his prior statements, in circumstances in which the witness has no apparent motive to lie and where the hearsay evidence is the sole proof of an essential element of the offense charged," the conviction cannot stand. *Id.* at 623 n.7. Analogizing to cases involving substantive use of a witness's inconsistent grand jury testimony, the Appeals Court added a requirement of corroboration before recanted spontaneous utterances, absent any evidence

---

defendant had not hit Joel, the jury were free to give more weight to the witness's repeated (and unprompted) references to the victims as "them" than to her later response to a single leading question.

Also admitted in evidence was the ambulance form completed by the EMT, which references Joel's statement that he had been "struck with [a] belt once across [right] hand and once across [right] lower leg." The Appeals Court assumed that the ambulance reports were not technically admissible as hospital records under G. L. c. 233, § 79, but noted that "[t]he interest of such a declarant (i.e., a person seeking medical assistance) in providing accurate information is the same whether the information is provided to emergency medical workers in an ambulance or to doctors and nurses at a hospital." *Commonwealth* v. *Moquette*, 53 Mass. App. Ct. 615, 619 n.3 (2002). Whatever their precise status, the records had been admitted, and the defendant's motion in limine with respect to those records had sought only to delete "all statements" in those records that had "reference to the question of liability." At the defendant's request, the records were redacted, although the defendant still contended that further redactions should have been made. The record pertaining to Joel, as redacted, made no reference to any crime having been committed or to the identity of the person who had struck Joel with the belt, but referenced the fact of Joel's having been struck by a belt as the injury for which he was then being examined. That underlying fact did not need to be redacted. See *Commonwealth* v. *DiMonte*, 427 Mass. 233, 242 (1998) ("fact-specific references to the reported cause of the [victim's] injuries are part of her medical history and are relevant to treatment" and therefore admissible as part of her medical record, but references to victim's being "assaulted" comprise "the ultimate conclusion of the crime charged" and should have been redacted). As such, the ambulance record also provided substantive evidence that Joel had been hit with a belt.

that some bias brought about the recantation, could suffice to support a conviction. *Id.* at 620-621, 623, citing *Commonwealth v. Noble*, 417 Mass. 341, 345-347 (1994), *Commonwealth v. Berrio*, 407 Mass. 37, 45 (1990), and *Commonwealth v. Daye*, 393 Mass. 55, 74 (1984). For the following reasons, we decline to add any requirement of corroboration to the spontaneous utterance exception to the hearsay rule.

A spontaneous utterance is sufficient, by itself, to support a conviction. See *Commonwealth v. Whelton*, 428 Mass. 24, 29-30 (1998); *Commonwealth v. Alvarado*, 36 Mass. App. Ct. 604, 607 (1994). See also *Commonwealth v. Joyner*, 55 Mass. App. Ct. 412, 417 (2002). In *Whelton*, the Commonwealth's only witness was the police officer who responded to the scene following the victim's daughter's emergency call. The daughter, visibly distraught, told the officer that the defendant had just hit, kicked, and pushed her mother. The victim told the officer that the defendant had pushed her off the sofa, intending that she would hit a table as she fell. The officer's testimony laid a sufficient foundation for introducing the daughter's statement as a spontaneous utterance, but did not include any description of the victim's emotional state that would warrant the conclusion that the victim was still under the sway of the exciting event. *Id.* at 26-27. The officer testified that he had not observed any bruises or marks on the victim. *Id.* at 25. The victim testified for the defense, denying that she had been hit or kicked and explaining that the defendant had "gently pushed or rolled her off the couch." *Id.* The court held that the victim's hearsay statement to the police should not have been admitted, but that the victim's testifying at trial for the defense avoided any substantial risk of a miscarriage of justice. *Id.* at 27. That left the daughter's spontaneous utterance as the sole evidence that the defendant had committed an assault and battery; there was no corroboration that the victim had been struck (i.e., no marks on her), and the victim testified at trial that there had been no assault and battery. The court rejected the defendant's argument that the evidence was insufficient to support a conviction: "The daughter's out-of-court statements, which . . . were admissible under the spontaneous utterance exception, established the elements of the crime charged. The weight of the evidence was a matter exclusively for the jury." *Id.* at 30.

That other evidence at trial may controvert the facts alleged in a spontaneous utterance does not change the fact that the spontaneous utterance has been admitted for substantive purposes and that it is for the jury to determine what weight to give that substantive evidence. See *Commonwealth* v. *King*, 436 Mass. 252, 256-257 (2002). The declarant's recantation is simply one form of evidence that may be offered to try to detract from the weight of the spontaneous utterance. See *id.*; *Commonwealth* v. *Napolitano*, 42 Mass. App. Ct. 549, 552-553 (1997); *Commonwealth* v. *Alvarado*, *supra* at 605. Or, the evidence refuting the content of the spontaneous utterance may come from a witness other than the declarant, as in *Commonwealth* v. *Whelton*, *supra*. The mere existence of such contrary evidence does not operate to add an additional requirement of corroboration in order for the spontaneous utterance to constitute evidence sufficient for conviction.[4] We reject the premise of the Appeals Court's analysis, namely, that there is something special or different about the declarant's own recantation of the substance of the spontaneous utterance that mandates some separate requirement of corroboration.[5]

That this court has required corroboration before a conviction may rest on certain other forms of out-of-court statements does not signal the imposition of a corroboration requirement for every exception that allows the substantive use of out-of-court statements. In *Commonwealth* v. *Daye*, 393 Mass. 55 (1985), the court addressed the issue of the substantive use of a witness's grand jury testimony when that testimony was inconsistent with the witness's trial testimony. Traditionally, the "settled" and indeed "orthodox" rule was that a witness's prior inconsistent statements were admissible only for purposes of

---

[4]Indeed, in *Commonwealth* v. *Whelton*, 428 Mass. 24 (1998), the evidence contravening the spontaneous utterance was even more weighty than that offered here: the victim denied that the assault occurred, there was no evidence of the victim's motive to lie, and the officer's observations of the victim did not corroborate the account of the attack provided by the declarant.

[5]Courts in other jurisdictions have similarly held that a conviction may be based solely on evidence admitted as a spontaneous utterance, despite the declarant's later recantation. See *Williams* v. *State*, 714 So. 2d 462, 463-466 (Fla. Dist. Ct. App. 1997); *People* v. *Fratello*, 92 N.Y.2d 565, 574 (1998), cert. denied, 526 U.S. 1068 (1999); *Commonwealth* v. *LaRosa*, 283 Pa. Super. 264, 270-271 (1980).

impeachment, but were inadmissible if offered for their truth. *Id.* at 66-67, and cases cited. In deciding to deviate from that rule and permit the substantive use of a witness's inconsistent grand jury testimony, the court was willing to do so only with certain safeguards. *Id.* at 73-75. There had to be "an effective opportunity for effective cross-examination of the declarant at trial," *id.* at 73, the grand jury testimony had to be the witness's own statement (not simply "yes" or "no" responses to leading questions or the product of pressure by the prosecutor or grand jurors), *id.* at 74 & n.20, and a conviction could not be "based exclusively" on inconsistent grand jury testimony. *Id.* at 74. See *Commonwealth* v. *Clements*, 436 Mass. 190, 192-193 (2002).

By way of comparison, this court did not impose a corroboration requirement in connection with the introduction at trial, for substantive purposes, of a witness's inconsistent testimony given at a probable cause hearing. *Commonwealth* v. *Sineiro*, 432 Mass. 735, 743-745 (2000). Unlike grand jury testimony, testimony at a probable cause hearing is given in open court, subject to the rules of evidence, where the defendant has both the motive and the opportunity to cross-examine the witness. *Id.* at 744. Because the circumstances attending a witness's inconsistent testimony at a probable cause hearing gave that testimony "sufficient intrinsic reliability," it could be introduced as substantive evidence "without the need for the type of corroboration required by *Daye*, or, for that matter, any other type of corroboration" (footnotes omitted). *Id.* at 745. As *Sineiro* illustrates, there is no requirement that substantive use of a witness's prior statement, inconsistent with the same witness's trial testimony, must always be accompanied by corroboration before that prior statement will suffice to support a conviction. Rather, the issue is whether the prior statement is of the type that bears "sufficient intrinsic reliability." *Id.* If it does, corroboration is not required.

Spontaneous utterances have long been admitted for substantive purposes precisely because they do bear sufficient indicia of reliability. "[T]he evidentiary rationale for permitting hearsay testimony regarding spontaneous declarations . . . is that such out-of-court declarations are made in contexts that provide substantial guarantees of their trustworthiness." *White* v. *Il-*

*linois*, 502 U.S. 346, 355 (1992). The spontaneous utterance exception "is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him." *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 222 (1973), quoting J. Wigmore, Evidence § 1747 (3d ed. 1940). See *Commonwealth* v. *King*, 436 Mass. 252, 256 (2002) ("it is the circumstances of the excited utterance that confer the requisite reliability"); *Commonwealth* v. *Whelton*, 428 Mass. 24, 28 (1998) ("A spontaneous utterance is highly reliable and falls within a firmly rooted hearsay exception"); *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285 (1990) ("an utterance is spontaneous if it is made under the influence of an exciting event and before the declarant has had time to contrive or fabricate the remark, and thus it has sufficient indicia of reliability"); *Commonwealth* v. *Dunn*, 56 Mass. App. Ct. 89, 93 (2002) ("spontaneity requirement [of spontaneous utterance exception] flows from a general belief that reflex breeds reliability"); *Commonwealth* v. *Carrasquillo*, 54 Mass. App. Ct. 363, 368 (2002) ("it is supposed that a person under stress tends to speak what comes spontaneously to mind, without energy or disposition to invent lies; his excited utterance is likely to be truthful in that sense, and so the hearsay objection is overcome"). Where the entire premise underlying the spontaneous utterance exception is that the circumstances tend to make such utterances reliable, we will not simultaneously impose a requirement that they be corroborated, a requirement that stems from the precise opposite concern that the form of out-of-court statement at issue lacks intrinsic reliability.

We recognize that the theory underlying the spontaneous utterance exception, namely, that the stress of the moment is likely to render the declarant's statement reliable, has itself come under recent criticism. See, e.g., Note, Timing Isn't Everything: Massachusetts' Expansion of the Excited Utterance Exception in Severe Criminal Cases, 79 B.U. L. Rev. 1241, 1265-1266 & nn. 177-182 (1999); Goldman, Distorted Vision: Spontaneous Exclamations as a "Firmly Rooted" Exception to the Hearsay Rule, 23 Loy. L.A. L. Rev. 453, 458-463 (1990). It is true, of course, that the external shock, the very feature that makes such statements reliable in the sense that they are unlikely to be the product of fabrication or contrivance, may in other respects make the statement inaccurate as to important details, which may be confused or exaggerated under the influence of that shock. For example, a witness who just observed a horrific accident may make some exclamation that is reliable as to the gist of what happened (as in, "that huge truck just ran right over the little sports car"), but still engage in hopelessly unreliable exaggeration (as in, "that truck was going at least 150 miles an hour"). As with any form of evidence, it is for the jury to determine what weight to give to a spontaneous utterance. And, as with any form of statement or testimony, the jury may decide to accept some parts and reject other parts of the statement or testimony. The jury thus sort out what aspects of a spontaneous utterance deserve credence and weight, and what aspects do not deserve credence or weight.

In any given case, the reliability of a particular spontaneous utterance may be attacked in various ways: by challenging whether the words now ascribed to the declarant were actually what the declarant said, whether the witness testifying to the spontaneous utterance misunderstood or misremembered the remark in the heat of the moment, or whether the excitement surrounding the event would have rendered the declarant's own observations confused or inaccurate. Or, as here, it may be argued that the declarant's contrary testimony at trial makes the prior spontaneous utterance unworthy of present credence. However, we will not treat that latter example as a subcategory of the spontaneous utterance exception that is automatically less

worthy of credence such that it warrants the imposition of a corroboration requirement.[6] Rather, it is up to the jury to determine whether to place greater weight on what the declarant said in the immediate aftermath of the event or on what the declarant is now saying at trial. "A statement that has been offered in a moment of excitement without the opportunity to reflect on the consequences of one's exclamation may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom." *White* v. *Illinois*, 502 U.S. 346, 356 (1992).

Here, the multiple spontaneous utterances of two declarants (Joel and Aneri) provided substantive evidence that Joel had been struck with a belt wielded by the defendant. Thus, even in the absence of any corroboration,[7] the evidence was sufficient to

---

[6]Nor will we split hairs even more finely and create the sub-subcategory of spontaneous utterances identified by the Appeals Court, i.e., spontaneous utterances the substance of which are recanted at trial by the declarant where the declarant witness had "no apparent motive to lie." *Commonwealth* v. *Moquette*, 53 Mass. App. Ct. 615, 623 n.7 (2002). Using this case as an example of that sub-subcategory, the cold record fails to support the conclusion that Joel had no reason to fabricate his later denial that he had been assaulted. There was evidence that Joel, after his initial statements, became "sullen" and "withdrawn." There is also the curious fact that, despite displaying his cut hand to the officer, he began to claim that he had not been hurt. Similarly, he told the EMT about having been hit with the belt, but denied any "pain or inj[ury]" or any "complaint." Most importantly, the jury observed the child's demeanor when he denied that "anything" had happened to him that morning, and also observed him decline to answer an explicit question as to whether he had been hit. Even working from a mere transcript, the reluctance of Joel and Aneri to testify is palpable, and their ostensible "recantations" are hesitant at best. The assessment of such recantations, and the motives that may have inspired them, should be left to the sound judgment of the fact finders who have observed the witnesses while they made those recantations.

[7]Although, for the reasons stated, we decline to impose a requirement that the Commonwealth present evidence to corroborate the recanted spontaneous utterances, we note that there was ample corroboration on this record. The officer's observation of Joel's injured hand, the mother's testimony, and the ambulance records all corroborated that Joel had also been hit. See note 3, *supra*. Moreover, the precision of the ambulance report, made out by an EMT immediately following his examination of Joel, also dispels any concern that Joel's and Aneri's spontaneous utterances to the effect that Joel had been struck were the product of "error, confusion, or misstatement" on the part of either the declarants or the testifying officers. *Commonwealth* v. *Moquette*, 53 Mass. App. Ct. 615, 622 (2002).

sustain the defendant's conviction of assault and battery by means of a dangerous weapon on Joel.

*Judgment affirmed.*